THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOE BROOKS, Defendant-Appellant.

First District (2nd Division)   No. 86—1107

Opinion filed September 20, 1988.

Paul P. Biebel, Jr., Public Defender, of Chicago (Emily Eisner, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund and Judy L. Groeneveld, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

Following a jury trial, defendant was found guilty of murder and sentenced to 30 years' imprisonment. He appeals, arguing that: (1) the trial court erred in failing to inquire into the bias of prospective jurors; (2) he was denied a fair trial by the assistant State's Attorney's references to the victim's family; (3) the evidence does not support his conviction; (4) he was denied a fair trial by the assistant State's Attorney's cross-examination; (5) the trial court erred in admitting evidence of his four prior convictions; (6) the trial court abused its discretion in sentencing him to 30 years' imprisonment; and (7) the voluntary manslaughter instruction given in this case incorrectly stated the State's burden of proof.

At trial, Mary Brooks, defendant's sister, testified that she lived with the victim, Edward Youngblood, and their two daughters. On February 8, 1985, defendant came to Mary's home at approximately 5:30 p.m., and the victim returned home two hours later. Defendant asked Youngblood for money that he owed him and, when the victim replied that he did not have it, defendant began "cussing" at him. The two men went into a bedroom to discuss the matter, but defend-

ant was still upset when they returned to the kitchen. Later in the evening defendant and Youngblood left the apartment together to go to a store, and when they returned they were no longer fighting but rather just talking. Youngblood went down to another apartment to visit some friends, and defendant followed him about 10 minutes later. The people in the apartment would not allow defendant to enter, so defendant and Youngblood returned to Mary's apartment, laughing and talking. At approximately 9 p.m., defendant and Youngblood returned to their friends' apartment, but about 10 minutes later Mary brought Youngblood back to her apartment. Youngblood later returned to the friends' apartment with his seven-year-old daughter, who returned to Mary's apartment shortly thereafter. Mary then heard a "commotion" and "cussing" and, upon going out in the hallway, saw Youngblood standing on the steps at the landing between the 8½ and the 9th floors of the apartment building, his arms and chest bleeding, and saw defendant standing on the landing between the eighth and ninth floors. Defendant was holding a knife with a blade approximately 12 inches long, which he was swinging toward Youngblood as Youngblood backed up the stairs. Mary pulled Youngblood away and he turned and walked into their apartment. Defendant also went into the apartment, stopped in the living room to make a phone call, and then walked into the room Youngblood was in and began swinging his knife at him. Youngblood picked up a chair and used it as a shield, and defendant began hitting the chair with the knife, breaking the chair. Youngblood then picked up a bookcase, holding it in front of him as he walked forward, forcing defendant to walk out of the apartment. Defendant continued swinging the knife towards Youngblood, and by the time they were out in the hallway, Youngblood was holding just one piece of the bookcase. Clarence Coleman and Joseph Williams came out of their apartment just as Youngblood was standing at the top of the stairs on the ninth floor and defendant stood on the landing between the eighth and ninth floors. Coleman and Williams grabbed defendant, trying to take the knife away from him. Youngblood threw the piece of bookcase he was holding at Brooks, but hit Williams instead. Defendant broke loose of the two men, "charged" up the stairs and stabbed Youngblood in the chest. Prior to this time Youngblood had not fought back or threatened defendant, but he now began to fight.

Clarence Coleman testified that on February 8, 1985, defendant and three others were in an eight-floor apartment drinking and gambling. At approximately 10 p.m., Youngblood and his daughter arrived. Defendant was drunk and upset, and Youngblood asked defend-

ant to come upstairs with him. He did not threaten defendant, but could not convince him to leave. When Mary came in, Youngblood and their daughter left with her. Approximately 15 minutes later Youngblood returned with his daughter, and when he left, defendant stated "I'm going upstairs to get that nigger." Defendant left, and approximately 20 minutes later Coleman heard a "commotion." He and Williams went out into the hallway and saw defendant holding a knife in his hands and Youngblood bleeding. Defendant charged at Youngblood, jabbing him with the knife, after Youngblood threw a stick towards him. Coleman never saw Youngblood threaten defendant, nor did he see Youngblood with a weapon.

A medical examiner testified that Youngblood had a total of four stab wounds, one to the left armpit, one to the left chest which punctured the left lung, one to the left elbow and one to the right lower back. Youngblood also had 12 incise wounds: three to his face, four on his chest, two on his back, two on his left arm, and a defense wound on the palm of his right hand. He also had a total of nine abrasions on his body. The doctor testified that all wounds were inflicted at approximately the same time and that Youngblood died as a result of the multiple stab and incise wounds.

Defendant testified on his own behalf. He stated that he asked Youngblood for money he owed him and Youngblood replied he would not pay it. Youngblood began arguing with defendant because defendant would not allow him to have any of his liquor. Youngblood "got in a heated rage" and came at defendant, but defendant's brother stepped in and "broke it up." Mary asked defendant to leave, which he did, and he did not return to Mary's apartment that day. Youngblood followed defendant out of the apartment, wanting to talk to him. Defendant responded that he had nothing to talk about with Youngblood and left to go to the store. Youngblood arrived at the store while defendant was there. Defendant then went to Coleman's apartment, where Youngblood arrived shortly before defendant fell asleep. When defendant awoke Youngblood was gone. Defendant denied ever telling Coleman he was "going to get" Youngblood. As defendant left the apartment he encountered Youngblood, who told him "I'm going to teach you about running me off," which defendant testified meant embarrassing him. Youngblood then began hitting defendant in the face with his fists. Defendant was dazed and as he began to fall backwards he reached forward, grabbing Youngblood around the waist and, feeling a knife in his waistband, took it from him. Youngblood ran upstairs and then returned with a stick which he used to beat defendant about the face and hands. Defendant fell down

as Youngblood advanced upon him, and defendant began swinging the knife "wildly." Coleman and Williams grabbed defendant while Youngblood chanted and called names, then threw his stick at defendant, hitting Williams. Youngblood ran back to his apartment, returning with a chair and a stick which had been part of a bookcase. He hit defendant with the stick while blocking himself with the chair. Defendant was swinging the knife at Youngblood, asking him "What's wrong with you?" After that Youngblood "lay there and quit swinging the stick." Defendant then left and went to a gas station, where he asked an attendant to call the police. When the police arrived he told them that he had been in a fight, that a "guy" was trying to kill him and that he had cut him. He also relinquished his knife to the police. The police took him to the hospital, where he was treated for cuts over his eye and finger and thumb and a splint was placed on his finger and thumb.

On cross-examination, defendant testified that he took the knife from Mary, then stated that he took it from "him" and not Mary. By stipulation, the defense presented evidence that defendant told a nurse at the hospital that he was hit on the right hand with an unknown object, he was examined and found to have swelling and tenderness of the left hand. There was an abrasion on defendant's right wrist and a half-inch superficial laceration on his face. Defendant was under the influence of alcohol and in acute distress.

The jury returned a verdict finding defendant guilty of murder, and the trial judge sentenced him to 30 years' imprisonment. He appeals.

OPINION

Defendant relies on the recent supreme court case of *People v. Reddick* (1988), 123 Ill. 2d 184, consolidated with *People v. Lowe*, cause No. 65002, in support of his argument that the jury instructions given in his case were incorrect and denied him a fair trial. This argument was not raised before the trial court, but defendant contends that this court should consider this issue under the plain error doctrine. (*Reddick*, 123 Ill. 2d at 198.) The instructions at issue state in part as follows:

"To sustain the charge of murder, the State must prove the following propositions:

*First*: That the defendant performed the acts which caused the death of Edward Youngblood; and

*Second*: That when the defendant did so, he intended to kill or do great bodily harm to Edward Youngblood; or he knew

that his act would cause death or great bodily harm to Edward Youngblood; or he knew that his acts created a strong probability of death or great bodily harm to Edward Youngblood; and

*Third*: That the defendant was not justified in using the force which he used." Illinois Pattern Jury Instructions, Criminal, Nos. 7.02, 24—25.06 (2d ed. 1981) (hereinafter IPI Criminal 2d).

"To sustain the charge of voluntary manslaughter, the State must prove the following propositions:

*First*: That the defendant performed the acts which caused the death of Edward Youngblood; and

*Second*: That when the defendant did so, he intended to kill or do great bodily harm to Edward Youngblood; or he knew that his acts would cause death or great bodily harm to Edward Youngblood; or he knew that his acts created a strong probability of death or great bodily harm to Edward Youngblood; and

*Third*: That when the defendant did so he believed that circumstances existed which would have justified killing Edward Youngblood; and

*Fourth*: That the defendant's belief that such circumstances existed was unreasonable." IPI Criminal, 2d No. 7.06.

In *Reddick*, the supreme court held that the IPI voluntary manslaughter instruction, when read in conjunction with the instruction for murder, fails to inform the jury that the State bears the burden of disproving mitigating mental states.

"The voluntary manslaughter instructions indicate that to obtain a voluntary manslaughter conviction the People must prove the existence of one of the alternative mitigating mental conditions which the People contend did not exist. By contrast, the murder instruction makes no mention of the mitigating mental conditions. These instructions essentially assure that, if the jury follows them, the jury cannot possibly convict a defendant of voluntary manslaughter. The reason is that even if a mitigating state is proved, it will have been proved by the defendant, not the People.

\* \* \*

The burden-of-proof instructions regarding both voluntary manslaughter and murder \*\*\* were thus incorrect in placing upon the People the burden of proving the existence of intense passion or unreasonable belief in justification. The instructions should have placed upon the People the burden of disproving

the existence of either of these two states of mind." (*Reddick*, 123 Ill. 2d at 194-97.)

The court went on to reverse defendants' convictions and remand their cases for new trials, holding that the incorrect instructions constituted "grave error" warranting reversal, even though defendants had not objected to the instructions as given.

The State responds that pursuant to the test announced in *People v. Erickson* (1987), 117 Ill. 2d 271, 513 N.E.2d 367, *Reddick* should not be applied retroactively. In *Erickson* the supreme court held that judicial opinions announcing new constitutional rules will be applied retroactively when the following factors are present: "(1) the case to which the new rule is to be applied was not final or was pending on direct review when the rule was declared and (2) the rule to be applied retroactively is of constitutional dimension." (117 Ill. 2d at 289.) The State maintains that *Reddick* relates to a procedural matter and is not of "constitutional dimension."

■ We disagree. *Reddick* held that the jury was not correctly instructed as to the State's burden of proof when the IPI jury instructions on murder and voluntary manslaughter were given. The right of an accused to have the State prove all the elements of his alleged crime (*People v. Turner* (1984), 127 Ill. App. 3d 784, 469 N.E.2d 368) is incontestably of constitutional dimension, and a ruling regarding that right must be applied retroactively.

The State also argues that defendant failed to present any evidence or argue that he had an unreasonable belief in justification, and therefore it did not have to disprove the mental state of unreasonable belief. The State further argues that any instruction on voluntary manslaughter, even an incorrect one, inured to the benefit of defendant. This argument is meritless, for our supreme court has held that "grave" and reversible error occurs when a jury is given an erroneous instruction on voluntary manslaughter. *Reddick*, 123 Ill. 2d at 198.

■ Finally, the State contends that the instant case is distinguishable from *Reddick* in that here the record, when viewed as a whole, demonstrates that the jury knew that the State bore the burden of disproving that defendant was acting with an unreasonable belief that the killing was justified. We disagree. There is nothing in the record of this case, whether we view its components separately or as a unitary whole, which would correct in any fashion the improper instruction the jury was given. Moreover, we must assume that the jury followed the instructions given (*People v. Bernard* (1986), 149 Ill. App. 3d 684, 500 N.E.2d 1074; *People v. Jackson* (1986), 145 Ill. App. 3d

626, 495 N.E.2d 1207), and therefore applied incorrect law.

Since defendant's conviction must be reversed and his case remanded pursuant to *Reddick* we need not resolve his remaining contentions. However, we address the following issues in the event that they arise again during retrial.

Defendant contends that he was denied a fair trial when the trial court failed to ask prospective jurors either individually or as a group if they would have any hesitation in returning a verdict of not guilty should the State fail to sustain its burden of proof and whether the prospective jurors understood that the defendant is presumed innocent and need not offer any evidence in his own behalf. *People v. Zehr* (1984), 103 Ill. 2d 472, 469 N.E.2d 1062.

In *Zehr*, the Illinois Supreme Court stated:

"We are of the opinion that essential to the qualification of jurors in a criminal case is that they know that a defendant is presumed innocent, that he is not required to offer any evidence in his own behalf, that he must be proved guilty beyond a reasonable doubt, and that his failure to testify in his own behalf cannot be held against him. If a juror has a prejudice against any of these basic guarantees, an instruction given at the end of the trial will have little curative effect. It is also vital to the selection of a fair and impartial jury that a juror who finds that the State has failed to sustain its burden of proof of guilt beyond a reasonable doubt have no prejudices against returning a verdict of not guilty." (103 Ill. 2d at 477.)

The court went on to hold that the trial court's refusal to ask questions tendered by defendant which covered the critical issues referred to by the supreme court in its opinion was prejudicial error requiring reversal. The court rejected the State's argument that the *voir dire* question to prospective jurors on their ability to follow the law as given by the court even though they might personally disagree with it was sufficient in and of itself to detect juror bias.

Defendant acknowledges that his counsel did not submit questions regarding jury bias, but contends that this court has held "in the analogous context of jury instructions that the court, not counsel, bears the burden of seeing that the jury is properly admonished on the presumption of innocence and burden of proof." (*People v. Williams* (1983), 120 Ill. App. 3d 900, 458 N.E.2d 1312.)[1] Defendant argues that the court's duty to question prospective jurors during *voir dire*

---

[1]Defendant testified at trial, so the question of his right not to testify is not an issue in this case.

on the presumption of innocence and burden of proof is even more important than the duty to instruct the jury, noting the *Zehr* court's statement that an instruction given at the end of trial will have little effect on a juror's bias. *Zehr*, 103 Ill. 2d 472.

Defendant also maintains that the trial judge's inaccurate statement of the law compounded his error in not asking the *Zehr* questions. He stated:

> "Under the law the defendant is presumed innocent of the charges in this indictment. This presumption will remain with Mr. Brooks throughout the trial until the twelve or fourteen of you, who are selected as jurors, at the conclusion of all the evidence become satisfied by the evidence in the case, if you can, beyond a reasonable doubt standard that Mr. Brooks is guilty.
>
> The law does not require Mr. Brooks to prove his innocence."

Defendant contends that the word "until" presumes guilt, and the word "satisfies" connotes an incorrect preponderance standard of proof.

The State responds that defendant has waived this issue by failing to submit suggested questions regarding juror bias, by failing to object to the lack of inquiry and by failing to raise the issue in a post-trial motion, relying, in support of its argument, on *People v. Visnack* (1985), 135 Ill. App. 3d 113, 481 N.E.2d 744, and *People v. Estes* (1984), 127 Ill. App. 3d 642, 469 N.E.2d 275. In *Visnack*, defense counsel requested that the court question prospective jurors as to their attitude toward defendant's right to refrain from testifying. The trial judge agreed to ask the question, but neglected to do so, without objection from defense counsel. The appellate court upheld defendant's conviction, stating:

> "Although the failure to question or instruct prospective jurors on this point [potential bias] has been considered reversible error (*People v. Zehr* (1984), 103 Ill. 2d 472, 477-78, 469 N.E.2d 1062), defendants have waived the issue by their failure to make a timely objection, and we cannot say that plain error exists here, in light of the overwhelming evidence against defendants." 135 Ill. App. 3d at 124.

In *Estes*, defense counsel made a vague suggestion that the trial court "just briefly assure that each individual juror will go along with the reasonable doubt standard." (*Estes*, 127 Ill. App. 3d at 655.) On appeal, Estes argued that the trial court's failure to question the prospective jurors regarding the State's burden of proof was reversible error. The appellate court declined to find a violation of the rule

announced in *Zehr*, stating:

"To find that the court has committed error here, where no question was actually submitted, in our opinion pushes the *Zehr* rule too far.

\*\*\* For us to rule that the court erred in refusing to allow a question which was not actually submitted would be to transform the duty of the trial court into an unreasonable burden." 127 Ill. App. 3d at 655.

In the event that this court finds that defendant has not waived this issue, the State maintains that the trial court adequately instructed and questioned prospective jurors regarding the presumption of innocence and the State's burden of proof. In addition to making the statement regarding the presumption of innocence, which defendant claims is incorrect, the trial judge also asked each individual juror whether he or she would be able to follow the judge's instructions and whether there was any reason why any juror could not be fair and impartial. The State also contends that the judge's misstatement of the law was harmless, because an instruction which accurately states the law regarding the presumption of innocence was given.

Because this case is remanded for a new trial, we need not decide this issue. During retrial, both parties will be required, of course, to adhere to *Zehr*, and to ensure that all issues which should be addressed in *voir dire* will, in fact, be covered.

Defendant next argues that he was denied a fair trial by the prosecutor's references to the victim's family. During his opening statement, the prosecutor made the following comments:

"Up until February 8, 1985 Edward Youngblood was the father of two little girls age 7, and up until February 8, 1985 he lived with a woman named Mary Brooks, the mother of those twin little girls, and he lived on that date in the projects at 4429 South Federal in Chicago. It's not too far from here. And up until February 8, 1985 things were tough for Edward Youngblood and Mary Brooks raising two little girls in the projects. Money for food, clothing—

DEFENSE COUNSEL: Objection.

THE COURT: Sustained.

PROSECUTOR: The evidence will show, ladies and gentlemen, that Edward Youngblood, like any father, did what he could to support his family.

DEFENSE COUNSEL: Objection.

THE COURT: Overruled.

PROSECUTOR: The evidence will show that Edward Youngblood was a good father.

DEFENSE COUNSEL: Objection.

THE COURT: Overruled.

PROSECUTOR: The evidence will show that Edward Youngblood[,] that Monday, because February 8, 1985 was a Friday, was to start a job, to do what he could for his family. But, you see, Edward Youngblood never made it to that job. He never made it. And he didn't make it because that man stabbed him multiple times to death, and he died. You are going to learn from the evidence, and the evidence is witnesses who take that witness stand, exhibits that you will see and have when you deliberate, and stipulations. *** You are going to learn from the evidence that Mary Brooks, Edward Youngblood's common-law wife, is the defendant's sister. That's right. He's the uncle of the twin little girls, Uncle Junior.

DEFENSE COUNSEL: Objection.

THE COURT: Overruled.

PROSECUTOR: Well, why would an uncle want to kill the little girls' father? Money? The evidence will show that Edward Youngblood borrowed money from that man and had problems paying it back. The defendant didn't like that. And that's where this begins in the early evening hours of February 8, 1985."

The prosecutor asked the following question of Mary Brooks:

"Q. Edward Youngblood, did he have an education?

DEFENSE COUNSEL: Objection.

THE WITNESS: Yes.

PROSECUTOR: Judge, I believe the jury has a right to know about the victim.

THE COURT: Overruled.

PROSECUTOR: Did he have an education?

A. Yes.

Q. Would you tell us what education he had?

A. He was a high school graduate and he had training in accounting and some training in the Army and Navy."

In his closing argument, the prosecutor again reminded the jury that the victim was the father of two little girls and stated that "[t]hings have gotten real hard" for the deceased's family.

Defendant contends that such references to the victim's family are improper and prejudicially arouse the sympathy and passions of

the jury. (*People v. Hope* (1986), 116 Ill. 2d 265, 508 N.E.2d 202; *People v. Bernette* (1964), 30 Ill. 2d 359, 197 N.E.2d 436; *People v. Beringer* (1987), 151 Ill. App. 3d 558, 503 N.E.2d 778.) Defendant further maintains that the prosecutor's comments about the quality of the deceased's life were particularly prejudicial in this case because the jury was required to decide whether the deceased had been the aggressor or at least involved in mutual combat.

The State argues that references to the victim's family were "unavoidable as explanatory of the crime" and incidental. The State further contends that such comments were invited by defense counsel; however, given that defendant complains of statements made during the prosecutor's opening argument, this argument is arrantly disingenuous. Finally, the State argues that any improper remarks were harmless error, because the evidence of defendant's guilt was overwhelming and the jury could not have come to a different result.

The prosecutor made numerous references to the quality of the victim's life and his family. There was testimony and evidence that defendant was involved in a fight with the deceased, and the prosecutor's remarks may well have influenced the jury to find defendant guilty of murder rather than a lesser offense. During retrial, the prosecutor must, as required by well-established and well-defined authority (*People v. Hope* (1986), 116 Ill. 2d 265, 508 N.E.2d 202; *People v. Bernette* (1964), 30 Ill. 2d 359, 197 N.E.2d 436; *People v. Beringer* (1987), 151 Ill. App. 3d 558, 503 N.E.2d 778), avoid making any references to the victim or his family which serve only to inflame the emotions of the jury.

Defendant next maintains that he was denied a fair trial by the prosecutor's failure to perfect impeachment of him. The prosecutor asked defendant the following questions:

"PROSECUTOR: Do you remember talking to the State's Attorney after your arrest, a person by the name of Thomas Wright? I believe you said you talked to police officers and a State's Attorney?

A. Right, yes.

Q. Do you remember telling the State's Attorney you stabbed Edward Youngblood one time?

A. Pardon me?

Q. Do you remember telling the State's Attorney Thomas Wright that you stabbed Youngblood one time?

A. I told him I stabbed Edward Youngblood.

Q. One time?

A. I didn't state how many times because I myself didn't

know how many times."

The State did not perfect impeachment when it failed to show that the alleged inconsistent statement was ever made. Defendant contends that this failure meant that he was subjected to an improper tactic of substituting insinuation and innuendo for proof. (*People v. Nuccio* (1969), 43 Ill. 2d 375, 253 N.E.2d 353; *People v. Starks* (1983), 116 Ill. App. 3d 384.) Defendant further maintains that since his defense was that he was involved in a fight, he therefore did not know how many times he stabbed the victim. According to defendant, the State's insinuation of a contrary statement minimizing the number of stabbings conveyed "a consciousness of guilt inconsistent with a genuine belief, either reasonable or unreasonable, that Brooks' conduct was justified." Defense counsel did not object to the above questions, because no error occurred until the prosecutor failed to present rebuttal evidence. (*People v. Nuccio*, 43 Ill. 2d 375, 253 N.E.2d 353.) In response to the State's argument that defendant waived this issue by failing to raise it in his post-trial motion (*People v. Lucas* (1981), 88 Ill. 2d 245, 430 N.E.2d 1091), defendant claims that this issue is reviewable under the doctrine of plain error (107 Ill. 2d R. 615(a)).

Addressing the merits of defendant's argument, the State contends that it has a right to cross-examine defendant on matters raised in his direct testimony in an attempt to explain, modify, discredit or contradict it. Additionally, the State argues that in order for the failure to complete impeachment to rise to the level of reversible error, the unfounded insinuation must be substantiated, repeated and prejudicial. *People v. Redman* (1985), 135 Ill. App. 3d 534, 481 N.E.2d 1272.

Defendant responds that the error need not be repeated before it requires reversal if it prejudices defendant, citing *People v. Giangrande* (1981), 101 Ill. App. 3d 397, 428 N.E.2d 503; however, that case did not involve failure to perfect impeachment. Here, the State should have perfected its impeachment and if the occasion arises on remand it should take care to do so.

Defendant next contends that the trial court allowed evidence of defendant's four prior convictions to go to the jury without considering "the probative value against the prejudice in allowing these convictions in evidence, or considering the obvious prejudicial effect of sending all four convictions back to the jury."

Defendant had four prior convictions: a 10-year old 1976 conviction for misdemeanor theft, simultaneous 1979 convictions for felony theft and possession of burglary tools, and a 1979 conviction for rob-

bery. In allowing evidence of these convictions to go to the jury, the judge stated:

> "All of them are within the ten years. All of them are either felonies or in the case of thefts or they in my opinion go to basic honesty and integrity, and so they are permissible provables."

Defendant argues that his convictions are not relevant to his credibility, but are inherently prejudicial, especially since the jury was told of all four of them.

The State responds that defendant has waived this issue by failing to raise it at trial and failing to raise it in his post-trial motion. In the event that this court finds that this issue is not waived, the State contends that the trial judge properly admitted evidence of defendant's convictions. The Illinois Supreme Court has held that the trial court may, in its discretion, admit evidence of defendant's prior convictions for impeachment purposes after balancing the probative value of those convictions against their prejudicial effect. (*People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695.) *Montgomery* does not require the trial judge to verbalize his thoughts, but requires only that the court consider the probative value of convictions and their prejudicial effect.

Here, the convictions were "permissible provables" and this court must therefore assume that the trial judge properly considered the prejudicial effect of admitting evidence of them before making his ruling.

For the foregoing reasons the judgment of the circuit court of Cook County is reversed and this cause remanded for a new trial.

Reversed and remanded.

HARTMAN, P.J., and EGAN, J., concur.