UNITED STATES of America, ex rel.
Bessie I. FLEMING, Petitioner,

v.

Richard B. GRAMLEY, Warden, Dixon
Correctional Center, Respondent.

No. 89–3252.

United States District Court,
C.D. Illinois,
Springfield Division.

April 5, 1990.

Gary R. Peterson and Daniel D. Yuhas, Office of State Appellate Defender, Springfield, Ill., for petitioner.

Douglas K. Smith, Asst. Atty. Gen., Springfield, Ill., and Scott Walden, Adams County State's Atty., Quincy, Ill., for respondent.

## OPINION

RICHARD MILLS, District Judge:

Habeas corpus.

Bessie Fleming was a battered wife who shot her husband in the head and a jury convicted her of murder.

The appellate court affirmed. *People v. Fleming*, 155 Ill.App.3d 29, 107 Ill.Dec. 801, 507 N.E.2d 954 (4th Dist.1987). And the Illinois Supreme Court denied leave to appeal. *People v. Fleming*, 116 Ill.2d 566, 113 Ill.Dec. 307, 515 N.E.2d 116 (1987).

The state's highest court then decided *People v. Reddick*, 123 Ill.2d 184, 122 Ill. Dec. 1, 526 N.E.2d 141 (1988) which held that the Illinois Pattern Jury instructions on murder and voluntary manslaughter contained two "grave errors." Relying on *Reddick*, Bessie returned to state court seeking collateral relief which was denied by the circuit court and affirmed by the appellate court on the ground that the error was not of "constitutional dimension."

Bessie now presents the same argument to this Court; however, we agree with the Appellate Court of Illinois, Fourth District, that the claimed error is not of constitutional magnitude and thus inappropriate for habeas relief.

## I. Facts

The following facts are taken from the opinion of the appellate court which affirmed Petitioner's conviction on direct review. These facts are presumed correct. 28 U.S.C. § 2254(d). Petitioner cites ten pages of "additional facts that are relevant to this proceeding" in her memorandum, however, these "facts" are merely a restatement of Petitioner's trial evidence with extensive quotations from the psychologist who testified on her behalf.

At the time of the murder Bessie was 48 years old with no prior criminal record. In 1981 she moved in with Tom Fleming and they were married in August of 1984. Tom was 52 years old, had previously been married three times, and was an alcoholic. The relationship was tempestuous and marked by vicious physical and psychological abuse. The attacks generally occurred after Tom had been drinking and were usually followed by periods of calm behavior. Expert testimony was uncontradicted that Bessie was a victim of the battered wife syndrome.

On the morning of March 6, 1986, police were called to Bestom Trucking in Quincy, Illinois, to investigate the death of Tom Fleming. Bestom was owned and managed by Bessie and Tom Fleming. Police advised Bessie of her *Miranda* rights and questioned her regarding Tom's death. Bessie was very cooperative and appeared calm, collected, polite, and soft-spoken.

During the next eight hours Bessie told *four* completely *different stories* relating to the events which led to the death of her husband. *First,* Bessie denied having any knowledge of or participation in the shooting. Bessie said that after arriving at Bestom that morning she left to buy breakfast and returned to find Tom lying on the floor. Bessie told police that she and Tom had a stable and fulfilling relationship.

Bessie changed her story after being questioned regarding ownership of a gun. In the *second* version, Bessie said that shortly after her marriage to Tom he began abusing her. The night before the shooting Bessie and Tom had an argument

and Bessie informed Tom of her intent to leave him. Tom, who had been drinking, stated that the only way she would ever leave him would be "feet first." The next morning Bessie again reiterated that she was leaving. Tom became very angry and stated that they would talk later.

Upon arriving at Bestom that morning Bessie worked with Tom for a short while then decided to go get breakfast. Bessie went to the bathroom and when she came out she noticed Tom standing by the tow motor. Tom hollered for her to come to him and as she started walking toward him she saw that he had a rug draped over his arm. As she got closer she noticed that Tom was holding a gun beneath the rug. When she got close enough, Bessie hit the rug, knocking the gun from Tom's hand. When Tom bent over to pick up a hook lying on the floor, Bessie picked up both the gun and the rug, placed the rug in front of the gun to stifle the noise, and shot twice striking Tom in the head.

Following further questioning Bessie told a *third* story which was taped and played for the jury at the trial. In this version she stated that she had gone to the bathroom and come back out when Tom hollered for her. Bessie stated that she felt something was going to happen because of Tom's previous threats. When she saw the rug draped over Tom's arm she picked up an iron prong and carried it with her to defend herself. When she saw that Tom was holding a gun she knocked it from his hand with the iron bar. Bessie then picked up the gun and the rug, placed the rug in front of the gun, and shot Tom once in the head. Bessie stated that Tom then said "What is happening?" whereupon she shot him a second time. Bessie then threw the rug in the office, placed the gun in her purse, and left in her car.

Bessie's *fourth* account of the story was also taped and played for the jury. On this occasion Bessie stated that Tom was in a foul mood because she was going to leave him. Bessie asked Tom for some money for breakfast and he told her to stay and answer the phone while he backed a trailer into the terminal. Apparently tired of tak-

ing the abuse, Bessie removed a gun from Tom's desk drawer. Although she stated that she was unfamiliar with guns, Bessie checked the gun to insure that it was loaded and cocked the weapon. Bessie then put a rubber glove on the hand in which she held the gun so that she wouldn't get any gunpowder residue on herself. Bessie had seen this particular trick on television. Bessie then placed the gun in her jacket pocket, picked up a rug, and walked out to the tow motor where Tom was working. Bessie waited until Tom was finished, placed the rug in front of the gun, and fired a shot towards Tom's head. Tom turned and started toward Bessie and she heard him say "What in the hell * * * ?" Bessie fired a second time and Tom fell to the floor. Bessie threw the rug in the office, put on a different jacket, placed the gun in her purse, and dropped the gloves in a wastebasket in the outer office.

At trial, Dr. Grant Johnson, State Pathologist, testified that Tom's death resulted from the destruction of his brain and that there was no evidence of alcohol or drugs in his body. Dr. Johnson was unable to ascertain whether Tom was "coming at" Bessie when he was shot.

The prosecution established a financial motive for the murder. Specifically Bessie had been making fraudulent entries in the business checking account and using the business account for personal expenses. Bestom had also failed to file timely financial statements with its affiliate company and the Fleming's residence was subjected to a tax sale due to delinquent real estate taxes. The Flemings were also delinquent on a business loan; however, this particular debt was paid off after Tom's death because he had purchased credit life insurance.

Dr. Frank Froman, a clinical psychologist, examined Bessie after her arrest and testified on her behalf at trial. Dr. Froman characterized Bessie as a classic battered woman and offered the opinion that even though Tom was unarmed or actively threatening Bessie she believed that deadly force was necessary to save her own life. Dr. Froman admitted during cross-exami-

nation that his opinions were based on the information Bessie had provided to him and that if she had been lying his opinion would change.

## II.   Jury Instructions

Under the applicable statutes at the time of Petitioner's conviction murder was defined as the killing of an individual with either intent or knowledge that the acts which cause death would result in death or great bodily harm or create a strong possibility of death or great bodily harm. Ill. Rev.Stat. ch. 38, ¶ 9–1(a) (1983). Voluntary manslaughter included all of the elements of murder plus the defendant had to either unreasonably believe that the killing was justified or be acting under a sudden and intense passion resulting from a serious provocation. Ill.Rev.Stat. ch. 38, ¶ 9–2 (1983).

The court instructed the jury that:

To sustain the charge of Murder, the State must prove the following propositions

First: That the defendant performed the acts which caused the death of Tom Fleming; and

Second: That when the defendant did so, [she intended to kill Tom Fleming or] she knew that her acts created a strong probability of death or great bodily harm to Tom Fleming; and

Third: That the defendant was not justified in using the force which she did. I.P.I. No. 7.02. In addition the jury was instructed that:

To sustain the charge of Voluntary Manslaughter, the State must prove the following propositions:

First: That the defendant performed the acts which caused the death of Tom Fleming; and

Second: That when the defendant did so, she intended to kill Tom Fleming; or she knew such acts created a strong probability of death or great bodily harm to Tom Fleming; and

Third: That when the defendant did so, she acted under a sudden and intense passion resulting from serious provocation by Tom Fleming; and

Fourth: That the defendant was not justified in using the force which she used. I.P.I. No. 7.04. The jury rejected Petitioner's defense of self-defense and convicted her of murder. Petitioner was then sentenced to a term of twenty years imprisonment. Petitioner has preserved a single argument before this Court—the jury instructions violated her fourteenth amendment due process right by relieving the State of its burden to prove an essential fact necessary to constitute the crime with which she was charged.

## III.   Analysis

One of the fundamental tenets of our justice system is that the Government bears the burden of proving beyond a reasonable doubt that the accused committed each element of the crime charged. *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Failure to inform the jury regarding the State's burden of proof on an element of the charged offense violates due process. *Cole v. Young,* 817 F.2d 412, 423 (7th Cir.1987). On the other hand, jury instructions which misstate, as a matter of state law, the burden of proof regarding an affirmative defense do not violate due process. *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). The question we must decide is whether the aforementioned instructions improperly assign the State's burden of proof on an essential element of the crime or an affirmative defense.

In *People v. Reddick,* 123 Ill.2d 184, 122 Ill.Dec. 1, 526 N.E.2d 141 (1988), the Illinois Supreme Court identified two errors in the standard burden of proof instructions for murder and voluntary manslaughter. First, the instructions required the State to bear the burden of proving the existence of one of the two mitigating factors necessary for voluntary manslaughter. *Id.* at 194–95, 122 Ill.Dec. at 5, 526 N.E.2d at 145. The defendant is the one who generally will introduce evidence on one of these two factors in an attempt to reduce the charge of murder to voluntary manslaughter. If the jury were to literally follow the instructions it could never convict a defendant of

voluntary manslaughter because the State would not introduce any evidence regarding the mitigating factors.

■ The second error identified by the *Reddick* court was that the instructions omitted the State's burden to disprove the existence of the mitigating factors to sustain a murder conviction once the defendant introduced some evidence of their existence.[1] *Id.* at 197, 122 Ill.Dec. at 6, 526 N.E.2d at 146. This is essentially the Petitioner's argument in this case.

Petitioner raised this argument on direct appeal to the fourth district of the appellate court. That court rejected her argument because her counsel failed to object to these instructions at trial, tender an appropriate instruction, or raise the issue in her post-trial motion. Although one of the defendants in *Reddick* committed these same procedural errors, the supreme court applied the "interest of justice" exception of Supreme Court Rule 451(c) to reach the issue.

The Illinois Supreme Court has declined to decide if the decision in *Reddick* is retroactive or of constitutional dimension. *People v. Harris*, 132 Ill.2d 366, 395, 138 Ill. Dec. 620, 547 N.E.2d 1241 (1989). Districts of the Illinois Appellate Court have held that it is retroactive but have split on whether the decision is of constitutional magnitude. *Compare People v. Brooks*, 175 Ill.App.3d 136, 142, 124 Ill.Dec. 751, 529 N.E.2d 732 (1st Dist.1988) ("[t]he right of the accused to have the State prove all the elements of his alleged crime is incontestably of constitutional dimension....") *with People v. Bolden*, 181 Ill.App.3d 481, 130 Ill.Dec. 97, 536 N.E.2d 1308 (4th Dist. 1989) (*Reddick* is not of constitutional dimension).

The first district in *Brooks* concluded in a single sentence that *Reddick* is "incontestably of constitutional dimension." On the other hand, the fourth district in *Bolden* discussed the issue extensively and analyzed the language of *Reddick* in reaching the conclusion that it is not of constitu-

tional magnitude. We find *Bolden* to be the better reasoned decision.

Petitioner contends that *Reddick* found an additional element to the crime of murder—disproof of either of the two mitigating factors. The court in *Reddick* specifically characterized these two mitigating factors as defenses. *Reddick*, 123 Ill.2d at 197, 122 Ill.Dec. at 6, 526 N.E.2d at 146. In addition, the General Assembly has amended the criminal code by reclassifying the offense of voluntary manslaughter as second degree murder and expressly placing the burden on the defendant to prove the existence of a mitigating factor by a preponderance of the evidence. Ill.Rev. Stat. ch. 38, ¶ 9–2 (1987). Commentators have construed this change as constitutional. *See* Steigmann, *First and Second Degree Murder in Illinois*, 75 Ill.B.J. 494, 495–96 (1987); O'Neill, *An Analysis of Illinois' New Offense of Second Degree Murder*, 20 J. Marshall.L.Rev. 209, 221–22 (1986); Haddad, *Second Degree Murder Replaces Voluntary Manslaughter in Illinois: Problems Solved, Problems Created*, 19 Loy.U.Chi.L.J. 995, 1016 (1988).

In light of this authority, we conclude that the mitigating factors are affirmative defenses, not elements of the crime of murder, and thus the error in the jury instructions, while violative of state law, did not violate Petitioner's due process rights. *See Engle v. Isaac*, 456 U.S. 107, 120–22, 102 S.Ct. 1558, 1567–69, 71 L.Ed.2d 783 (1982).

Petitioner placed a great deal of reliance on the recent decision in *United States ex rel. Falconer v. Lane*, 720 F.Supp. 631 (N.D.Ill.1989). The facts in *Falconer* are similar to those in the instant case. Phyllis Falconer became angry at her husband, chased him through their home, stabbed him in the back with a butcher knife, and then argued self-defense. The jury convicted her of murder after receiving the same standard instructions on murder and voluntary manslaughter at issue in this case.

---

**1.** Effective July 1, 1987, the offense of voluntary manslaughter was reclassified as second degree murder and the burden of proof as to the exist-

ence of the mitigating factors was expressly placed upon the defendant. P.A. 84–1450, § 2, Ill.Rev.Stat. ch. 38, ¶ 9–2 (1987).

In ruling on her petition for habeas relief, *Falconer* recognized that the State could place the burden of proof regarding on affirmative defense on the defendant consistent with due process. The court then stated that was not the problem in *Falconer*. The court reasoned:

> The trial court properly instructed the jury on the elements of murder. The court also properly instructed the jury on the elements of voluntary manslaughter. The court did not, however, instruct the jury that if it found serious provocation or unreasonable belief in justification it could *not* convict Ms. Falconer of murder. On the contrary, it stated that a person is justified in using deadly force "only if she *reasonably* believes that such force is necessary to prevent imminent death or great bodily harm to herself." Thus, the instructions did not merely shift the burden of proof on the affirmative defenses; rather, they deprived Ms. Falconer of her affirmative defenses entirely: If the jury found that Ms. Falconer intentionally killed her husband without a reasonable belief that her use of force was necessary, then it had to convict her of murder regardless of whether she acted under serious provocation or under an unreasonable belief that she was justified in using the force she did.

*Falconer,* 720 F.Supp. at 643. We are not entirely clear what constitutional violation that court found in the jury instructions. From the language it used it appears that the court believed that the instructions deprived Ms. Falconer of her affirmative defenses entirely and thus violated her right to due process.

We do not agree.

If a person *reasonably* believes that deadly force is necessary to prevent their imminent death or great bodily harm then they are not guilty of any crime. In effect, self-defense is a complete defense. On the other hand, if a person *unreasonably* believes that deadly force is necessary, then they would be guilty of voluntary manslaughter, not murder.

In support of its decision that the jury instructions violated Ms. Falconer's constitutional rights by depriving her of an affirmative defense, the *Falconer* court cited the decision in *United States ex rel. Reed v. Lane,* 759 F.2d 618 (7th Cir.1985). Although the court in *Reed* held that deprivation of the affirmative defense of compulsion violated the petitioner's due process rights, the analysis employed in that case yields a different result in the case at bar.

The defendant in *Reed* was convicted of two murders and an armed robbery. Reed participated in a murder after being told by Hall that he would be killed if he refused to aid in the crime. Immediately after the first murder, Hall killed a second person while Reed stood by in the hallway. The state court refused to instruct the jury on the defense of compulsion because this defense is unavailable to someone charged with a capital crime. Reed was eligible for the death penalty because he had participated in two or more murders.

The constitutional violation found by the district court related to the due process requirement that an individual must be given adequate notice that his contemplated conduct is illegal. Employing the legal fiction that a person faced with a decision regarding potential criminal conduct is aware of the relevant statutes, the court analyzed the case in terms of what Reed knew at the moment he was presented with the choice to aid in the first murder or be killed. At that point in time, he was faced with the prospect of killing a single individual which was not a capital crime. Therefore, he would have expected the defense of compulsion to be available to him. Reed could not have known that a later event (the second murder) would deprive him of this defense.

In the instant case, Petitioner testified that her moment of decision came when she was in the office and her husband yelled to her. At that point she put on a rubber glove, picked up a gun, checked to see if it was loaded, and then walked out and shot her husband. At Petitioner's moment of decision, she was aware that the law only provided a defense to her actions if she was

in imminent danger of death or great bodily harm. Reasonably or unreasonably she had to perceive that the danger was imminent. *People v. Seiber*, 76 Ill.App.3d 9, 31 Ill.Dec. 726, 394 N.E.2d 1044 (3d Dist.1979). At her moment of decision, Petitioner must have realized that her husband was only a future danger and thus she was not permitted to use deadly force. Petitioner's actions were not self-defense, nor were they voluntary manslaughter, they were murder. Therefore, the analysis and decision of *Reed* are inapplicable to the case at bar.

The State suggests in its response to the petition for a writ of habeas corpus that the perceived constitutional error in cases such as *People v. Brooks*, 175 Ill.App.3d 136, 124 Ill.Dec. 751, 529 N.E.2d 732 (1st Dist.1988) is that the *Reddick* instructions constructively deprive a defendant of a lesser included offense instruction. The State then proceeds to explain that there is no constitutional right to a voluntary manslaughter instruction under the old Illinois statutes.

As explained by the State, the offense of voluntary manslaughter is not actually a "lesser included offense" of murder. Voluntary manslaughter fails to meet the definition of a "lesser included offense" found in *Brown v. Ohio*, 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977) because it does not have fewer elements than murder, it has more. *People v. Shumpert*, 126 Ill.2d 344, 351–52, 128 Ill.Dec. 18, 533 N.E.2d 1106, 1109 (1989) (voluntary manslaughter is "murder plus"). Voluntary manslaughter also does not have a less culpable mental state than murder so as to meet the alternative definition of a lesser included offense contained in Ill.Rev.Stat. ch. 38, ¶ 2–9(a) (1987). It appears that the only reason voluntary manslaughter was referred to as a "lesser included offense" of murder is because of the lesser penalty.

With this understanding in mind, it clearly is not a constitutional violation to deprive a defendant of this type of "lesser included offense" instruction. *See Schmuck v. United States*, — U.S. —, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989) (Fed. R.Crim.P. 31(c) does not entitle a defendant

to a lesser included offense instruction unless all the elements of the "lesser" offense are a subset of the elements of the greater offense).

As a final note we recognize that in limited situations jury instructions can be so prejudicial as to support a collateral attack on the constitutional validity of a state court's judgment. *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977). To rise to this level, however, the instruction must so infect the entire trial that the resulting conviction violates due process. It is *not* enough that the instruction is "undesirable, erroneous, or even universally condemned." *Id.* Clearly the instructions in the case at bar fall far short of rising to this level.

### IV. Harmless Error

■ The State also contends that if this Court were to find a constitutional violation in the jury instructions, any error would be harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 23–24, 87 S.Ct. 824, 827–828, 17 L.Ed.2d 705 (1967).

We agree with the State.

The Petitioner's testimony at trial establishes that she did not believe that she was in *imminent* danger of death or great bodily harm. This testimony was substantially identical to her fourth statement to the police which was introduced in the State's case in chief and thus it would make little difference which side bore the burden of proof on this issue.

In addition, at trial Petitioner's attorney objected to allowing the jury to consider voluntary manslaughter and in closing argument urged the jury to reject a verdict of voluntary manslaughter. Petitioner now suggests that it was only the improper instructions which led the jury to reject a verdict of voluntary manslaughter.

Finally, there was abundant evidence that Petitioner had not been honest with Dr. Froman who admitted that his conclusions were based on the facts she related to him and that he placed a great deal of weight on the Petitioner's honesty with

him. The jury may well have rejected Dr. Froman's conclusions as based on inaccurate data. Even if the jury accepted the evidence of the effect of the battered woman syndrome on Petitioner, it did not constitute a defense under Illinois law.

In light of all of these considerations, even if we had found a constitutional infirmity in the jury instructions, we would conclude that such error was harmless beyond a reasonable doubt. *See People v. Beacham*, 189 Ill.App.3d 483, 136 Ill.Dec. 868, 545 N.E.2d 392 (1st Dist.1989) (erroneous instructions on murder and voluntary manslaughter harmless beyond a reasonable doubt).

### V. Conclusion

We conclude that the jury instructions on the crimes of murder and voluntary manslaughter, although violative of state law, did not deprive Petitioner of her due process rights under the fourteenth amendment. Furthermore, even if we were to find constitutional error, we conclude that such error was harmless beyond a reasonable doubt.

*Ergo*, Petitioner's petition for a writ of habeas corpus (d/e 1) is DENIED.