(No. 64144.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. TERRY HARRIS, Appellant.

*Opinion filed December 7, 1989.*

Paul P. Biebel, Jr., and Randolph N. Stone, Public Defenders, of Chicago (Kyle Wesendorf, Assistant Public Defender, of counsel), for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Inge Fryklund and Marie Quinlivan Czech, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MILLER delivered the opinion of the court:

The defendant, Terry Harris, was found guilty of murder, aggravated criminal sexual assault, and aggra-

vated kidnapping in a jury trial in the circuit court of Cook County. The defendant waived his right to a jury for purposes of a death penalty hearing, and the trial judge sentenced the defendant to death for the murder conviction. The trial judge sentenced the defendant to concurrent 30-year terms of imprisonment for his convictions for aggravated criminal sexual assault and aggravated kidnapping. The defendant's execution was stayed pending direct review by this court. Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d Rules 603, 609(a).

The victim in this case, 24-year-old Emma Hopkins, and the defendant were acquaintances from their employment at the same service station in Chicago. Emma was a cashier at the station, and the defendant worked there as a security guard. On the afternoon of October 28, 1984, the defendant went to the station shortly before Emma's shift was scheduled to end. As Emma was leaving work, she agreed to give the defendant a ride to a nearby street. The defendant later told authorities that he and Emma decided to go somewhere to talk. They went first to a forest preserve and then to a factory area, where, according to the defendant, they engaged in consensual sexual relations in the back seat of the car. It was the defendant's contention, both in his formal statement to the authorities and in his testimony at trial, that he strangled the victim following the discharge of a gun they were struggling over. Afterwards, the defendant dragged the victim's body from the car and hid it nearby.

The victim's body was discovered around 11 o'clock in the morning on October 29 by workers at a vegetable oil processing plant located in the 1300 block of East 99th Street in Chicago. The body had been wedged in an access area under a storage tank, or vat, on the factory premises. Police were summoned to the scene, and the

officers found that the victim was clothed in a dress, a bra, a half-slip, and part of a pair of stockings.

Raphael Davidson, a co-employee of Emma and the defendant, testified at trial. Davidson said that he arrived at the service station, which was located at Division Street and Pulaski Road, around 1:30 p.m. on October 28. Emma and another person were on duty at the time, and Davidson was to relieve them at 2 o'clock. The defendant came to the station around 1:45 that afternoon. Although the defendant was dressed in his security guard uniform and had his gun with him, he said that he was not scheduled to work that day. Later, when Emma was getting ready to leave, Davidson heard the defendant ask her what direction she was going and whether he could have a ride to a certain street. Emma agreed to give the defendant a ride, and they left together in Emma's car; she was driving. Davidson testified that Emma's boyfriend called the station five or six times later that day. Davidson also said that the victim had been employed at the station for several weeks and that he had not previously seen Emma and the defendant together.

The victim's mother, Mrs. Emma Carter, testified that Emma was scheduled to work at the service station from 8 a.m. until 2 p.m. on Sunday, October 28, 1984. Emma held a second job as a security guard at a bus station, and on that Sunday she was supposed to work there from 4 p.m. until midnight. Mrs. Carter said that her daughter would come home between jobs to change into the uniform she wore as a security guard. Mrs. Carter testified that sometime during the evening of October 28 she received a telephone call from one of Emma's co-workers at the bus station informing her that Emma had failed to report for work that afternoon. Mrs. Carter then made a number of telephone calls in an effort to locate her daughter. Having no success, Mrs.

Carter notified the police that her daughter could not be found, and a missing-persons report was formally entered the next morning, October 29.

Mrs. Carter and Emma lived in separate apartments in the same building in the 700 block of South California Avenue in Chicago. During the morning of October 29 Mrs. Carter listened to the tape on her daughter's telephone answering machine. Mrs. Carter found the following message recorded on the machine:

"Emma, this is Terry. I'm finished with the car. When you call me at my house and I'll—I'll come bring it to you. Okay? Thanks for letting me use it."

Mrs. Carter testified that she did not recognize Terry as an acquaintance of her daughter. Mrs. Carter also said that Emma had a boyfriend, Tom Jenkins, and was not dating anyone else.

James Kinnebrew, a family friend, was present when Mrs. Carter played the tape on the answering machine. After hearing the tape, Kinnebrew went to the service station where Emma was employed. There, Kinnebrew spoke with station employee Raphael Davidson, who told Kinnebrew that the victim had left work the previous day with Terry, a security guard at the station. Kinnebrew learned Terry's home address through the assistance of the police, and that afternoon Kinnebrew, a nephew, Samuel Cline, and one of Emma's brothers, Renard Carter, drove to Terry's neighborhood. There, they found Emma's car parked in front of the address that Kinnebrew had been given. After a while, they saw the defendant, accompanied by a woman and a child, leave the residence. The woman put a duffle bag or laundry bag in the trunk of Emma's car, and the three drove off.

Cline and Carter followed the defendant in their own vehicle. After driving a short distance, the defendant parked Emma's car, and he and his companions entered a nearby building. Cline summoned the police. When the

defendant came out of the building sometime later, he explained to an officer that he had borrowed the car from a fellow employee. The officer then searched the car and found a .38-caliber, five-shot revolver in the glove compartment; the gun contained four live rounds and one spent round. The defendant was taken into custody at that time.

Following his arrest on October 29, the defendant was questioned by Chicago police officer Patrick Mokry. The defendant initially told Officer Mokry that Emma had lent him her car the previous afternoon so that he could use it in moving to a new residence. He said that he dropped the victim off at her apartment and then drove downtown to see a movie. After the movie ended, he drove around the Loop area for a while and went home.

Officer Mokry questioned the defendant again the next day, October 30. Officer Mokry informed the defendant that the movie theater the defendant claimed to have attended had been closed for several weeks, that seminal material had been found on the victim's camisole, and that an oily substance on a floor mat in the victim's car was similar to a substance present in the area of the storage tank where the victim's body had been discovered. Confronted with those facts, the defendant said that he had strangled the victim. Mokry then notified an assistant State's Attorney of the defendant's admission.

Later the same evening the defendant gave a formal statement in the presence of Assistant State's Attorney Mark Lukanich, Officer Mokry, and a court reporter. The defendant's statement was introduced into evidence at trial. In the statement, the defendant said that he lived in Chicago in the 7900 block of South Laflin and that he was employed as a security guard by a security agency. The defendant said that he arrived at the service station

by bus around 1:45 p.m. on October 28. He was not scheduled to work that day, but Emma, whom he had known for two or three weeks, had told him on the preceding Tuesday that she would be there then. As Emma was leaving work, the defendant asked her what direction she was going. She said that she was going south, and he then asked her if she would drop him off at Chicago Avenue. She agreed to do so. According to the defendant, during the drive they talked about his wife's leukemia, which a friend had told him of earlier that day, and about Emma's boyfriend. The defendant said that Emma saw that he was upset when they reached Chicago Avenue, so she continued driving. She asked him if he wanted to go somewhere to talk, and he suggested a forest preserve located in the southeast part of the city, near 134th Street and the Calumet Expressway. There, they sat in the car and talked until around 6:45 that evening, when the forest preserve closed. The defendant said that at some point he and Emma switched positions in the front seat, because he was using the car radio.

The defendant told authorities that after the forest preserve closed he and Emma drove to a factory area near Olive-Harvey College. They continued their conversation there. According to the defendant, they began kissing and later moved to the back seat of the car, where they engaged in sexual relations for two hours. Afterwards they returned to the front seat, and the defendant again sat in the driver's seat. The defendant had with him the revolver he was allowed to carry in his capacity as a security guard, and he said that as he was later placing the gun in the glove compartment of the car, Emma put her hand on the barrel and asked if she could examine the weapon. As he pulled the gun from her, it discharged, firing harmlessly into the floor of the car. The defendant said that he "lost control. I got upset by the fact that she made the gun went [sic] off. I

grabbed her by the throat." After the gun fired, the defendant let it drop to the floor of the car. According to the defendant's statement, he squeezed on Emma's throat as hard as he could, and she went limp. The defendant said that he panicked when he realized that Emma was dead. He then pulled her body from the car and hid it in one of the nearby vats. Driving home, the defendant realized that the victim's shoes and underpants were still in the car, and he threw them out the window. The defendant said that he used Emma's car the next day to move some items, including a duffle bag filled with clothes, to a building on the north side of Chicago. The defendant also said that he left a message on Emma's answering machine so that he would not be suspected of killing her.

Following the discovery of the victim's body, an autopsy was performed on October 30, 1984, under the supervision of Dr. Edmond Donoghue, deputy chief medical examiner of Cook County. At trial, Dr. Donoghue testified that an external examination of the victim revealed 16 evidences of injuries. The victim had sustained a number of abrasions around her neck, a hemorrhage to the eyelid, a swelling on the forehead, two gravel-encrusted abrasions on the right cheek, bruises on both the upper and lower lips, and abrasions on her right leg. Dr. Donoghue testified that an internal examination revealed 10 evidences of injury to the victim. These included a number of hemorrhages of the neck muscles and organs in the neck, hemorrhages under the victim's scalp, bite marks on both margins of the tongue, hemorrhages in the perineum, and hemorrhages in the right and left walls of the pelvis.

Dr. Donoghue stated that the cause of the victim's death was manual strangulation. He explained that the abrasions on the victim's neck, as well as the internal injuries to the neck, had been caused by strangulation, and

that bite marks on the tongue are commonly seen in cases of strangulation. Dr. Donoghue stated that the swelling over the victim's right eye, the bruises on her lips, and the hemorrhages under her scalp were all consistent with the infliction of blunt force trauma. Dr. Donoghue stated that the injuries to the victim's perineum and pelvis also were consistent with blunt force trauma, and he believed that the victim had been sexually assaulted. On cross-examination, Dr. Donoghue said that although the injuries to the pelvis and perineum were severe, it was possible that they could have been caused by vigorous sexual intercourse.

At trial, the State presented certain physical evidence, as well as the results of laboratory tests on some of the items of evidence. A knife in a sheath was found on the front seat of the victim's car, under the middle armrest. Emma's purse and a garment that apparently was her gas station work smock were in the trunk of the car. It was established that four latent fingerprints found on the victim's car matched the defendant's fingerprints. Tests showed that the chemical composition of a viscous substance on a floor mat in the car was consistent with the composition of a similar substance found where the victim's body had been hidden. In addition, tests of the carpet covering a hole in the car's front floorboard near the transmission hump revealed a small residue of burnt gunpowder, and a perforation in the carpet was said to be consistent with the size and shape of a bullet. Finally, tests of vaginal, oral, and rectal swabs made during the victim's autopsy revealed that seminal material was present on the vaginal swab. Also, seminal material was found on Emma's camisole, which had been discovered under the back seat of her car.

The defendant testified in his own behalf at trial, and he was the only witness called by defense counsel. The defendant's testimony was virtually identical with the

formal statement previously introduced into evidence by the prosecution. The defendant testified that his initial statement to Officer Mokry, in which he mentioned going to the movie theatre, was a lie, and that everything in the formal statement was true. The defendant said that at the time of the homicide he had been separated from his wife for four or five months. He had known the victim for about two weeks, and he said that one time he had taken her to a restaurant but that they had never kissed previously. The defendant denied ever having seen the knife found on the front seat of the victim's car.

In his testimony, the defendant admitted killing Emma. Describing the circumstances that led to the victim's death, the defendant testified that as he was placing his gun in the glove compartment of the car, Emma grabbed the weapon by the barrel, placed her hand over the trigger guard, and refused to let go. According to the defendant's testimony, Emma was pulling the gun toward her when it went off, and it was pointed in his direction. The defendant testified that he then grabbed the victim by the throat, first with only one hand; his other hand was on the gun. He explained that he was trying to get the gun out of the victim's grasp because it was pointed toward him. After Emma let loose of the gun, the defendant let it drop to the floor, and he then put his other hand around her throat. He said that he lost control when the gun fired and was afraid that it would discharge again. The defendant said that after strangling the victim, he pulled her from the car and stuffed her body inside an opening he found at the bottom of a nearby vat, or tank.

The jury returned verdicts finding the defendant guilty of murder, aggravated criminal sexual assault, and aggravated kidnapping. At the close of the State's case in chief, the trial judge had directed a verdict for the defendant on a count charging the defendant with the

armed robbery of the victim's purse. Following the return of the verdicts, the State requested that a capital sentencing hearing be held. The defendant then waived his right to a jury for purposes of the hearing.

The defendant's sentencing hearing began on May 8, 1986, and, following a recess, concluded on May 14. At the first stage of the hearing, the State introduced into evidence a copy of the defendant's birth certificate, which showed that the defendant was 23 years old at the time of his commission of the murder in this case. The trial judge found that the defendant was eligible for the death penalty under section 9—1(b)(6) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)), murder occurring in the course of certain enumerated offenses, including aggravated criminal sexual assault and aggravated kidnapping.

At the second stage of the death penalty hearing, the State presented evidence of four prior offenses committed by the defendant. This information was introduced through the testimony of the police officers who had arrested the defendant on those occasions.

Chicago police officer Michael Capesius testified that on July 11, 1982, he arrested the defendant on a charge of unlawful use of weapons. He stopped the defendant for questioning and saw that the defendant was carrying a gun in a shoulder holster under his jacket. The weapon was a six-shot tear gas revolver, and it contained four live rounds. The defendant subsequently pleaded guilty to the offense, a misdemeanor, and was sentenced to one year of conditional discharge.

Officer H.A. McCarthy testified that on May 6, 1984, he saw the outline of a handgun under the defendant's vest and stopped the defendant on a Chicago street. The defendant said that he was a police officer and produced a badge from the county probation department. The defendant had no further identification, however, and

the officer took him into custody. The defendant was carrying a loaded .38-caliber Rossi revolver. The officer later learned that the defendant was actually employed as a security guard but was not on duty at the time of his arrest. The defendant was eventually convicted of unlawful use of weapons and sentenced to 30 days' incarceration and one year's probation.

Chicago police officer Joseph Laskero testified that on May 29, 1984, he went to an apartment building in connection with a narcotics investigation. As Laskero and his partner were walking up a flight of stairs in the building, the defendant appeared and held a gun to Officer Laskero's head. The officers were in plain clothes, and Laskero identified himself as a police officer and instructed the defendant to drop the weapon. The defendant hesitated and started to point the gun at Laskero's partner. Laskero then grabbed the gun and wrested it from the defendant's control. The defendant was searched at the station house, and marijuana and 24 live rounds of ammunition were discovered on him. The defendant was subsequently convicted of aggravated assault and possession of marijuana.

Officer Michael Bonadonna testified that on September 8, 1984, he was working an undercover assignment on an elevated railroad platform in Chicago. He saw that the defendant had a gun in a shoulder holster under his open jacket. The weapon turned out to be a loaded five-shot Rossi revolver. The defendant explained to the officer that he was employed as a security guard at a Woolworth's store at a specified location. The defendant was taken into custody, and the officers later learned that there was no Woolworth's store at the location mentioned by the defendant. The defendant failed to appear at a scheduled court date on the charge, and at the time of his arrest in connection with the instant offenses

there was an outstanding warrant in connection with the earlier charge.

At the second stage of the hearing the State also introduced into evidence a resume of the victim, victim impact statements by Emma's mother and by an aunt, and a number of petitions signed by persons who favored imposition of the death penalty in the present case.

The defendant's evidence in mitigation consisted of the testimony of his mother, Agnes Badgett, and of one of his sisters, Helen Brown. The two women described the defendant's upbringing and related their favorable impressions of the defendant. The defendant also testified at the hearing. He said that he had sent a letter to the victim's family, apologizing for her death. He averred that he committed the killing unintentionally and that he was guilty only of manslaughter, and not of the other offenses for which he had been convicted.

Following the presentation of evidence in aggravation and mitigation, the trial judge sentenced the defendant to death for the murder conviction. The trial judge also sentenced the defendant to concurrent 30-year terms of imprisonment for the convictions for aggravated criminal sexual assault and aggravated kidnapping, describing those sentences as the maximum permitted for the offenses.

I

The defendant raises a number of issues concerning the trial proceedings conducted in the instant case. First, the defendant contends that the trial judge erred in refusing to accept his pretrial waiver of a sentencing jury and in death qualifying the jury that was selected to hear the trial. Before trial, the defendant sought to waive his right to a jury for purposes of a capital sentencing hearing. At the same time, defense counsel asked that the venire not be examined regarding their

attitudes toward capital punishment. The trial judge refused to accept the jury waiver, and during *voir dire* the judge asked the prospective jurors whether their views on the death penalty would interfere with their consideration of the evidence of the defendant's guilt or innocence. The defendant now argues that the trial judge's refusal to accept the jury waiver, together with the subsequent death qualification of the jury, was error under *Daley v. Hett* (1986), 113 Ill. 2d 75.

*Hett* held that a circuit judge has the authority to accept a defendant's pretrial waiver of a jury for purposes of a later death penalty hearing and that the judge, having accepted such a waiver, may therefore refuse to question prospective trial jurors regarding their views on capital punishment. After *Hett*, this court ruled in *People v. Erickson* (1987), 117 Ill. 2d 271, 287-88, that a trial judge must accept such a pretrial waiver by a defendant, if the waiver is voluntary and knowing. *Erickson* did not decide, however, whether a judge accepting such a waiver would be precluded from questioning prospective jurors about capital punishment. Instead, the court in *Erickson* concluded that the decision in *Hett* would not apply retroactively to cases pending on direct review at the time of the decision in that case, June 20, 1986. (See also *People v. Shum* (1987), 117 Ill. 2d 317, 339.) Because the present case was pending on direct review at the time of our decision in *Hett*, *Hett* can have no application here.

The defendant next argues that error occurred in the trial testimony of Dr. Edmond Donoghue, the physician who supervised the victim's autopsy. On direct examination Dr. Donoghue testified, without objection, that he believed that the victim had been sexually assaulted. He said that his opinion was based on the evidence of the injuries to the victim's pelvis and perineum as well as the circumstances concerning the victim's eventual discovery.

The defendant now argues that the opinion testimony was improperly admitted into evidence.

Dr. Donoghue assigned the following grounds in support of his opinion that the victim in this case had been sexually assaulted:

"Well, the basis of my opinion, would be a number of things: The fact that she was found in a remote location. That her clothes were in disarray. That her panties were—had been removed. That massive injuries to the pelvis and the area between the rectum and the vagina. The fact that she was strangled."

The defendant contends that Dr. Donoghue's opinion testimony was improperly admitted because it concerned an ultimate issue in the case and because it was based in part on matters that were within the common ken of jurors, such as the circumstances under which the victim was found. The defendant asserts that the testimony went to the heart of the defense in the present case, which was the defendant's claim that his sexual activity with the victim was entirely consensual. The defendant also notes that the prosecutor referred to the doctor's opinion testimony in closing argument.

Defense counsel did not object to Dr. Donoghue's opinion testimony, and counsel failed to raise the question in the defendant's post-trial motion. Accordingly, an objection to the admission of the testimony has not been preserved for purposes of review. (See *People v. Stewart* (1984), 104 Ill. 2d 463, 488.) We would also note in this regard that defense counsel, in his cross-examination of the witness, made further inquiry concerning the doctor's opinion. The defendant argues, however, that the admission of the testimony was plain error and therefore cognizable on appeal notwithstanding trial counsel's procedural defaults. See 107 Ill. 2d R. 615(a) (on review, "[p]lain error or defects affecting substantial rights may

be noticed although they were not brought to the attention of the trial court").

It was once the case that a physician could not testify to his opinion that a victim has been sexually assaulted. (*E.g., People v. Kwilosz* (1938), 368 Ill. 461, 462; *People v. Schultz* (1913), 260 Ill. 35, 40-42.) The basis for the rule was that an expert's expression of an opinion on an ultimate issue could only invade the fact-finding role of the jury. (See *Kwilosz,* 368 Ill. at 462 ("The testimony admitted was a usurpation of the province of the jury and beyond all question its admission was error"); *Schultz,* 260 Ill. at 41 ("The testimony of [the doctor] in this case trenched upon the jury's province and he gave an opinion on matters which they were competent, and which it was their duty, to decide").) Current case law, however, permits an expert witness to testify to an opinion on an ultimate issue in a case. *Merchants National Bank v. Elgin, Joliet & Eastern Ry. Co.* (1971), 49 Ill. 2d 118, 122; see also *Freeding-Skokie Roll-Off Service, Inc. v. Hamilton* (1985), 108 Ill. 2d 217, 221 (discussing lay witnesses; citing Federal Rule of Evidence 704).

We believe that Dr. Donoghue's testimony was proper. Dr. Donoghue was a forensic pathologist and was board-certified in anatomic and forensic pathology. As an expert in those fields, Dr. Donoghue was competent to render an opinion on the question whether the victim had been sexually assaulted. We believe that the basis for his opinion could properly include not only the medical evidence concerning the nature and extent of the victim's injuries, but also the other circumstances referred to, including the evidence pertaining to her disappearance and eventual discovery. His expertise and training qualified him as an expert on the matters at issue here. The jury remained free to accept or reject this testimony. We conclude that Dr. Donoghue's opinion testimony was proper. Accordingly, the admission of his testi-

mony was not error, much less plain error. We therefore have no occasion to consider here the defendant's related contention that trial counsel's failure to preserve the matter for review constituted ineffective assistance of counsel.

The defendant next contends that portions of the State's argument at trial were prejudicial. The defendant complains of some nine instances of allegedly improper comments by the State during argument. Specifically, the defendant argues that the prosecutor improperly dwelled on the personal characteristics of the victim, misstated the law, derogated the reasonable doubt burden, and made inflammatory statements that were not supported by the evidence. With one exception, discussed later, the trial judge sustained all objections that defense counsel made to the comments in question. Such action is generally sufficient to cure an error in argument (see *People v. Carlson* (1980), 79 Ill. 2d 564, 577), and we believe that to be true here. In many other instances, however, trial counsel failed to register a contemporaneous objection to the remark, which denied the trial judge the opportunity to rule on the matter and take steps to cure any impropriety. For the reasons set out below, we do not consider that the unobjected-to remarks "were so inflammatory that defendant could not have received a fair trial or so flagrant as to threaten deterioration of the judicial process. (*People v. Owens* (1984), 102 Ill. 2d 88, 104.)" *People v. Albanese* (1984), 104 Ill. 2d 504, 518.

The defendant first cites several instances in which he alleges the prosecutor improperly dwelled on the personal characteristics of the victim. At the beginning of his summation, the prosecutor said:

"You learned about the type of person that Emma Lee Hopkins was in life. You will have an opportunity to take most of these photos back with you in the jury room

when you deliberate, but this is a young girl who was raised in Mississippi, had been in Chicago about three years, was about five foot one, not much taller than her mother, who had two jobs, both as a security guard and as a cashier at the Amoco station. And while many of us are at home asleep on Sunday mornings, she was up on that Sunday, October 28th, out to her job at the Amoco station as a cashier.

I think the evidence shows from all of the witnesses that she was hard working, she was consciencious [*sic*], responsible and, undoubtedly, very trusting *** ."

During rebuttal argument, the prosecutor asked, "Did you see him on the stand, sitting here looking out at Mrs. Carter and her family?" The prosecutor continued his remarks by stating that the defendant had not shown any remorse for the offenses; the trial judge sustained the defense objection to the comment. Later in rebuttal, the prosecutor stated:

"The real tragedy of the last few days since this trial began, over a year ago, Emma Hopkins was his victim. Over a year ago he put his hand around her neck and took her life away from her. But the last few days, that tragedy has not ended. If anything, it's gotten worse because Emma Carter had to sit there with her family and friends. She's had to listen to him victimize her daughter again. She's had to listen to him get up there and tell you and everyone else in the courtroom that her daughter was the type of girl that would want to crawl into the back seat of a car with something like this.

Emma Hopkins' name is, to this very day, still smeared.

[Defense counsel]: Objection to this, Judge.

THE COURT: Objection will be sustained. Go on to something else."

The defendant argues that the comments quoted above improperly dwelled on the characteristics of the victim and her family. We do not agree. The defense theory at trial implicitly asserted that the victim would

abandon her second job as a guard at the bus station so that she could talk to the defendant. To that extent, the prosecutor's references to the evidence regarding the victim's work habits were proper. By the same token, the jurors would have understood the prosecutor's rebuttal comments as simply a restatement of the defense theory. The prosecutor's rhetorical question to the jurors whether they had seen the defendant on the stand was invited by the defendant's own argument that the victim's family had had to endure the thought that the victim had been raped and kidnapped, offenses with which the defendant had been charged. Finally, any impropriety in the prosecutor's fleeting comment that the victim's name had been smeared was, we believe, cured by the trial judge's prompt ruling sustaining the defendant's objection to the comment.

The defendant also argues that in argument the prosecutor misstated the law of voluntary manslaughter. The prosecutor said:

> "In other words, if you find that the fact, if you even believe Terry Harris, that Emma had the barrel of the gun and he had the butt of the gun, and when that gun fell down and discharged he was so scared and so enraged that he killed Emma Hopkins, if you find that that gun going off, that that was sufficient provocation for him to kill Emma Lee Hopkins, then the verdict would be voluntary manslaughter. But if that provocation, if you find it to be minor, if you find it to be insignificant, if you find it to be no justification at all under any circumstances to kill someone, then the verdict should be one of murder, ladies and gentlemen."

Defense counsel made no objection at trial to the argument. The defendant now argues that the prosecutor's statement was inaccurate. The defendant's disagreement with the statement appears to be twofold. First, the defendant argues that the prosecutor's argument was not an accurate statement of the law concerning self-de-

fense and voluntary manslaughter. Self-defense, however, was not at issue here. The trial judge instructed the jury only on the "heat of passion" variety of voluntary manslaughter (see Ill. Rev. Stat. 1985, ch. 38, par. 9—2(a)) and refused defense counsel's request that the jury also be instructed on the "unreasonable belief" variety (see Ill. Rev. Stat. 1985, ch. 38, par. 9—2(b)). Second, the defendant argues that the prosecutor's reference to "justification" suggested to the jurors that a manslaughter verdict would indicate their condonation of the defendant's misconduct. We do not agree. We believe that the prosecutor's reference to justification would have conveyed to the jury the idea, expressed elsewhere in the quoted passage, that provocation warranting a verdict of voluntary manslaughter must be, as the statute requires, reasonable rather than unreasonable.

The defendant also contends that the prosecutor derogated the burden of proof governing criminal prosecutions. In rebuttal the prosecutor said, "[O]ur burden is to prove him guilty beyond a reasonable doubt. Well, that's a small hurdle in this case, and we have about jumped twice the height of that to get over it." Trial counsel did not object to the statement. The defendant now argues that the comment suggested that the State's burden of proof was slight. We do not agree. The comment was simply an assertion by the prosecutor regarding the strength of the evidence in the present case. The jury was properly instructed on the burden of proof, and we find no error in the statement.

In his final series of challenges to the State's argument at trial, the defendant argues that the prosecution made a number of inflammatory statements that had no basis in the evidence. The defendant complains of the prosecutor's remarks (1) that the defendant "tortured the family of the victim a little bit," (2) that there was no evidence of a relationship between the victim and the

defendant, (3) that there was "not one single shred of evidence in this case of voluntary manslaughter," and (4) that defense counsel would consider a voluntary manslaughter conviction a "win." The trial judge sustained defense objections to the first and last of those comments; no objection was made to the second; when an objection was made to the third comment, the judge suggested that the jurors would either accept or reject the statement, depending on whether they thought it was true. We do not believe that the judge's rulings on the comments failed to secure to the defendant a fair trial. We note that with respect to the one comment on which the judge was not asked to rule, concerning the absence of a relationship between the defendant and the victim, the prosecutor went on to state that the defendant had known the victim for at most "two weeks." Thus the prosecutor recognized that the victim was acquainted with the defendant, and the context of the comment thus suggests that the prosecutor meant something different when he used the term "relationship." Although the defendant claimed to have taken the victim to a restaurant on one occasion, there was no evidence that they shared a relationship in any other sense.

The defendant also argues that the trial judge improperly restricted defense counsel's argument at the close of trial. The defendant contends that the judge erred in the rulings he made on several of the State's objections. These matters may be discussed briefly. First, the trial judge sustained a prosecution objection to defense counsel's comments that the State had presented fingerprint evidence in an effort to "sidetrack" the jury. The ruling was not inappropriate, for the comment could be construed as objectionable. Moreover, the comment came after defense counsel noted that there was no disagreement in this case that the defendant had been present in the victim's car. Defense counsel thus was

able to make his point that the fingerprint evidence was not vital to the prosecution's case.

During argument defense counsel commented that of the victim's 16 external injuries, "thirteen of those were abrasions, and two of them involved the eyes." The prosecutor objected, saying "Not the evidence, Judge." In ruling on the objection the trial judge stated, "Well, it isn't exactly, I would agree with you, but the jury heard the evidence. If their version is different than what the lawyers say, they will disregard it. Continue." The defendant contends that the judge's statement was an improper expression of personal opinion. We do not agree. The trial judge's statement suggested simply that the autoptic evidence was somewhat different from counsel's description but that the jurors' recollections would be determinative.

Finally, in closing argument defense counsel suggested, in related comments, that the investigation in the case ceased when the State was "satisfied" with the defendant's statement. The trial judge stated that the comments were speculative and sustained the prosecutor's objections to them. " 'The character and scope of argument to the jury is left very largely to the trial court, and every reasonable presumption must be indulged in that the trial judge *** properly exercised the discretion vested in him.' (*People v. Smothers* (1973), 55 Ill. 2d 172, 176.)" (*People v. Shum* (1987), 117 Ill. 2d 317, 351.) We find no abuse of discretion in the rulings here.

The defendant next argues that the trial judge erred in instructing the jury on the predicate felonies that would support the charge of felony murder. At the close of the State's case in chief, the trial judge directed a verdict in the defendant's favor on the charge of armed robbery. The armed robbery count alleged that the defendant had robbed the victim of her purse, and the

judge found insufficient proof of those allegations. At the close of evidence, although the armed robbery count was no longer pending, and there were no other charges of armed robbery against the defendant, the trial judge instructed the jury, over the defendant's objection, on the offense of felony murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(3)) predicated on armed robbery. Also, the trial judge instructed the jury, without objection, on the other theories of murder with which the defendant had been charged: intentional murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(1)), knowing murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(2)), and felony murder predicated on aggravated criminal sexual assault and aggravated kidnapping. A general verdict form was used, without objection. The defendant now argues that instructing the jury on felony murder predicated on armed robbery violated double jeopardy.

The defendant correctly observes that the trial judge's order directing a verdict on the armed robbery count constituted an acquittal and therefore precluded any further proceedings on that charge. (See *Smalis v. Pennsylvania* (1986), 476 U.S. 140, 90 L. Ed. 2d 116, 106 S. Ct. 1745.) We agree with the defendant that the same charge could not later serve as a predicate for felony murder. But we do not believe that the instructions used in this case violated double jeopardy. The felony murder count predicated on armed robbery did not specify the proceeds of the robbery. In allowing armed robbery to serve as a predicate for felony murder, the trial judge stated that he believed that the evidence was sufficient to show that the defendant had robbed the victim of her automobile. There was no suggestion here that the predicate conduct for felony murder (taking the victim's car) was the same conduct alleged in the charge on which the trial judge had directed a verdict in the defendant's favor (taking the victim's purse). If there

was an error in the proceedings, then, it pertained not to a purported retrial on conduct for which the defendant had previously won an acquittal, but rather to the failure of the indictment to specify the conduct underlying the count charging felony murder predicated on armed robbery. The defendant, however, did not make that objection at trial, nor has he raised the issue in the present appeal, and therefore we do not consider the question.

Before this court the parties have filed supplemental briefs concerning one final issue pertaining to the trial proceedings. The defendant's theory of the case was that he was guilty, at most, of "heat of passion" voluntary manslaughter (see Ill. Rev. Stat. 1985, ch. 38, par. 9—2(a)), and, at defense counsel's request, the trial judge instructed the jury on that form of voluntary manslaughter. The defendant now observes that instructions of the type used in the present case have since been disapproved (see *People v. Reddick* (1988), 123 Ill. 2d 184), and he argues that a new trial, in which the appropriate instructions would be used, is therefore necessary.

The jury in the present case received, without objection, the then-standard definitional instructions on murder and voluntary manslaughter. (See Illinois Pattern Jury Instructions, Criminal, Nos. 7.01, 7.03 (2d ed. 1981) (IPI Criminal 2d).) The jury also received, without objection, the then-standard issues, or burden of proof, instruction for voluntary manslaughter. (See IPI Criminal 2d No. 7.04.) But the trial judge modified the then-standard issues instruction for murder (see IPI Criminal 2d No. 7.02) by adding the following to the list of propositions the State was required to prove: "Third: The defendant was not acting under intense passion brought on by serious provocation." Thus, by the instructions used in this case, to sustain the charge of murder the State was required to disprove the extenuating element

alleged by the defendant in his claim of voluntary manslaughter.

In *Reddick* the court identified two defects in the existing jury instructions used in cases in which the jury was to be instructed on both murder and voluntary manslaughter, in either of its two forms. First, the then-standard issues, or burden of proof, instructions for voluntary manslaughter required the State to prove the existence of the extenuating element that serves to distinguish each form of voluntary manslaughter from murder. (*Reddick*, 123 Ill. 2d at 194-95.) The court noted that the prosecution would not normally offer proof on the extenuating element, and in that event literal application of the instruction would preclude a jury from returning a guilty verdict on that charge. Second, the then-standard issues instruction for murder did not require the State to disprove the existence of the extenuating element. (*Reddick*, 123 Ill. 2d at 195-97.) The court likened the extenuating elements to affirmative defenses, which, other than insanity, the State must disprove, once the defendant has satisfied his burden of production on the issue. See Ill. Rev. Stat. 1985, ch. 38, par. 3—2.

As we have seen, the jury in the present case was instructed that the State bore the burden of proving the nonexistence of the extenuating element of provocation. Thus, the modified instruction used in this case, though not entirely in conformity with the *Reddick* decision (*cf.* IPI Criminal 2d No. 7.02B (1989 Supp.) ("*Reddick*" issues instruction for use when jury is to be instructed on both murder and "heat of passion" voluntary manslaughter)), anticipated the second problem identified in *Reddick*. Although the instructions used in this case, by requiring the State to prove the existence of the extenuating element, failed to address the first defect identified in *Reddick*, we do not believe that the jury's deliberations would have

been affected. Here, the defendant's trial evidence was virtually identical with the formal statement he gave the authorities, which the State introduced into evidence. In this case, then, the defendant cannot complain that the jury could not have found that the extenuating element had been established by the State.

In view of the strong evidence of guilt in this case, as well as the hybrid instruction the trial judge gave the jury, we do not believe that the defendant was prejudiced in this regard. Assuming, without deciding, that *Reddick* would apply to the instant case and that the error would be of constitutional magnitude, we conclude that any error occurring in the present proceeding was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (standard for harmless constitutional error); *People v. Skipper* (1989), 177 Ill. App. 3d 688 (supplemental opinion on denial of rehearing) (*Reddick* error harmless beyond a reasonable doubt); *People v. Carter* (1988), 177 Ill. App. 3d 593 (same).) In light of our result, we do not consider the remaining issue raised by the parties: whether *Reddick* applies retroactively to cases that were pending on direct appeal at the time of that decision.

## II

The defendant also raises a number of arguments concerning the capital sentencing hearing that was conducted in the present case. The defendant first contends that certain victim impact evidence was improperly presented during the sentencing hearing, in violation of *Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529, and *People v. Simms* (1988), 121 Ill. 2d 259. At the sentencing hearing, the State introduced into evidence victim impact statements by Emma's mother and by one of Emma's aunts, a copy of Emma's resume, and petitions signed by a number of persons expressing their be-

lief that the death penalty should be imposed in the present case. The defendant contends that the evidence should have been excluded, and he asks that the cause be remanded for a new sentencing hearing.

At the second stage of the sentencing hearing, the prosecutor read into the record portions of a victim impact statement that had been prepared by the victim's mother, Mrs. Emma Carter. The entire statement was made a part of the record. In the victim impact statement, Mrs. Carter said that she had experienced difficulty eating and sleeping since her daughter's death, and she expressed her fears for the safety of her surviving children. Mrs. Carter also stated that she believed that the death sentence was the appropriate penalty in this case. Mrs. Patricia Banks, an aunt of the victim, made a statement in open court, though she was not sworn as a witness. Mrs. Banks described the family's grief over the killing and asked the judge to sentence the defendant to death. The State also introduced into evidence a number of petitions, bearing some 850 signatures, calling for imposition of the death penalty in this case. Finally, the State introduced into the record a copy of the victim's resume. The prosecutor referred to some of these matters in his argument at the conclusion of the second stage of the sentencing hearing. Following the parties' arguments and a brief recess, the trial judge sentenced the defendant to death. Defense counsel did not make a contemporaneous objection to the introduction of the victim impact evidence; defense counsel raised the issue later in a post-sentencing motion, which the trial judge denied.

Following the post-sentencing hearing in this case, the United States Supreme Court held, in *Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529, that victim impact evidence is not admissible at a capital sentencing hearing. In that case, involving the murder of an elderly couple, the prosecution introduced into evi-

dence at the defendant's death penalty hearing a victim impact statement. The statement described the personal characteristics of the victims, the effects of the crimes on the surviving family members, and the survivors' characterizations of the offenders. The Court ruled that introduction of that information at the defendant's capital sentencing hearing was a violation of the eighth amendment. See also *South Carolina v. Gathers* (1989), 490 U.S. 805, 104 L. Ed. 2d 876, 109 S. Ct. 2207.

In the present case, the State argues that *Booth* does not apply to bench sentencing proceedings, such as the hearing in the present case, that the issue has been waived because the defendant failed to make a contemporaneous objection to the admission of the evidence, and that any error in the introduction of the victim impact statements and petitions was harmless beyond a reasonable doubt. The State makes no contention that the victim impact statements of Mrs. Carter and Mrs. Banks and the petitions urging the defendant's execution were not material that would be barred by *Booth*. We need not determine here whether the victim's resume would also be barred by *Booth*.

We have previously applied *Booth* to bench proceedings. (See *People v. Crews* (1988), 122 Ill. 2d 266; *People v. Simms* (1988), 121 Ill. 2d 259.) Moreover, we consider that the matter here is one of plain error. Any uncertainty whether the trial judge relied on the victim impact statements and the petitions in imposing sentence was dispelled at the post-sentencing hearing. At that time the defendant specifically challenged the introduction of the victim impact statements and the petitions at the sentencing hearing. Discussing that evidence, the trial judge stated:

> "So it's my opinion that this evidence was properly entered in the second phase. I will indicate to you that I considered it and I considered it carefully. There were a

number of people from the community here that expressed their opinion. Numbers are not that important. The fact that some of the people's signatures may not have been valid or the addresses were not valid would not, in and of itself, change my opinion or decision in this matter. But I will tell you that I was, if the people in the community and people who are directly there, the neighbors, family, I considered that. They were very much concerned and appeared to feel that the ultimate penalty was appropriate for their protection and for the trauma they suffered. I believe, under the cases cited, it's appropriate."

In view of those comments, we believe that it is clear that the trial judge improperly relied on the victim impact information, including the relatives' statements and the petitions, in deciding to sentence the defendant to death. See *Simms*, 121 Ill. 2d at 274.

Although we are unable to agree with the defendant's additional contention that death is an inappropriate disposition in this case, we conclude that a new sentencing hearing is necessary, and we therefore vacate the defendant's death sentence. We also vacate the defendant's sentences of imprisonment; we note that the sentence imposed for the defendant's conviction for aggravated kidnapping, which in this case was a Class 1 felony, exceeded the maximum allowed for an offense of that class.

For the reasons stated, the defendant's convictions are affirmed, and his sentences are vacated. The cause is remanded to the circuit court of Cook County for a new sentencing hearing.

*Convictions affirmed;*
*sentences vacated;*
*cause remanded.*