NOTICE: Under Supreme Court Rule 367 a party has 21 days after

the filing of the opinion to request a rehearing. Also, opinions

are subject to modification, correction or withdrawal at anytime

prior to issuance of the mandate by the Clerk of the Court.

Therefore, because the following slip opinion is being made

available prior to the Court's final action in this matter, it

cannot be considered the final decision of the Court. The

official copy of the following opinion will be published by the

Supreme Court's Reporter of Decisions in the Official Reports

advance sheets following final action by the Court.

                                    

          Docket Nos. 79254, 79302 cons.--Agenda 10--May 1996.

      KEVA RICHARDSON et al., Appellees, v. JEFFREY CHAPMAN et al.,

                               Appellants.

                     Opinion filed January 30, 1997.

          JUSTICE MILLER delivered the opinion of the court:

          The plaintiffs, Keva Richardson and Ann E. McGregor, were

injured when the car in which they were riding was hit from behind

by a truck driven by defendant Jeffrey Chapman in Highland Park.

The plaintiffs brought the present action in the circuit court of

Cook County against Chapman; his employer, Tandem Transport, Inc.,

successor to Carrier Service Company of Wisconsin, Inc.

(Tandem/Carrier); and Rollins Leasing Corp., which had leased the

truck in Wisconsin to Chapman's employer. Following a jury trial,

the court entered judgment on verdicts in favor of Richardson and

McGregor and against Tandem/Carrier and Chapman. The court later

entered judgments against Rollins under the Wisconsin financial

responsibility statute for the unsatisfied portions of the two

awards. The court also permitted Rollins to obtain reimbursement

for those expenses from Tandem/Carrier on a theory of contractual

indemnity. A divided appellate court affirmed all the judgments

against the defendants. Nos. 1--91--1736, 1--91--1737, 1--91--3868,

1--92--1221, 1--92--1442 cons. (unpublished order under Supreme

Court Rule 23). In addition, the appellate court allowed Rollins'

claims for reimbursement from Tandem/Carrier on theories of both

contractual and implied indemnity. We granted the petitions for

leave to appeal filed by Rollins and by Chapman and Tandem/Carrier

(155 Ill. 2d R. 315(a)) and consolidated the causes for purposes of

oral argument and disposition.

          The accident at issue here occurred in the early morning

hours of November 26, 1987, at the intersection of Interstate 94

and Clavey Road in Highland Park. Plaintiff Keva Richardson was the

driver of the car, and plaintiff Ann McGregor was a passenger in

the vehicle. While stopped at a traffic light, their car was struck

from behind by a semi-trailer being driven by defendant Chapman.

Richardson suffered extensive injuries as a result of the accident

and was rendered quadriplegic. McGregor sustained only slight

injuries in the accident and has returned to her normal activities.

At trial, Richardson introduced extensive testimony concerning her

injuries and the expenses she will likely incur in the future as a

consequence of the accident. That testimony will be summarized

later in this opinion.

          The plaintiffs brought the present action against

Chapman, Tandem/Carrier, and Rollins. The plaintiffs' second-

amended complaint comprised three counts. Count I was against

Rollins and alleged that the lessor was vicariously liable for

Chapman's negligence under an agency theory. Count II, also against

Rollins, alleged that the lessor was liable under the terms of the

Wisconsin financial responsibility law. Count III, against

Tandem/Carrier and Chapman, was based on common law negligence.

Prior to trial, the judge granted Rollins' motion for summary

judgment on count I, and that count is no longer at issue. Count II

was severed prior to trial and was not submitted to the jury. The

case proceeded to trial on count III alone.

          At the close of evidence, the trial judge directed a

verdict in favor of the plaintiffs and against Tandem/Carrier and

Chapman on the question of liability. Determining only the

plaintiffs' damages, the jury returned verdicts against

Tandem/Carrier and Chapman and in favor of Richardson and McGregor

in the amounts of $22,358,814 and $102,215, respectively.

Tandem/Carrier and Chapman, through their insurance carrier, Home

Indemnity Company, subsequently tendered $1 million to the

plaintiffs in partial satisfaction of the judgments; of that sum,

$990,000 was credited to the judgment in favor of Richardson, and

$10,000 to the judgment in favor of McGregor. At a later hearing

the trial court considered the plaintiffs' claims against Rollins

under the Wisconsin financial responsibility statute, and the judge

determined that Rollins was liable to the plaintiffs for the

portions of the judgments unpaid by Tandem/Carrier and Chapman. The

court therefore entered judgment against Rollins and in favor of

Richardson for $21,368,814, and judgment against Rollins and in

favor of McGregor for $92,215, representing the unsatisfied

portions of their awards from Tandem/Carrier and Chapman. Rollins

had filed a counterclaim against Tandem/Carrier seeking contractual

indemnity, and counterclaims against Tandem/Carrier and Chapman

seeking both implied indemnity and contribution. Following a

hearing, the trial judge entered judgment in Rollins' favor on the

count seeking contractual indemnity but denied the counts seeking

contribution and implied indemnity. The judge also entered a

finding for contractual indemnity against Chapman, the driver of

the vehicle, though Rollins had not sought recovery from him under

that theory.

          The appellate court affirmed the judgments entered

against Tandem/Carrier and Chapman on the plaintiffs' negligence

claims against them, as well as the judgments entered against

Rollins on the plaintiffs' statutory claims under the Wisconsin

financial responsibility statute. The appellate court rejected the

defendants' challenges to the amounts of damages awarded by the

jury, and the court also rejected the defendants' arguments that

certain trial errors had inflated the verdict returned in favor of

Richardson. In addition, the appellate court held that the

Wisconsin financial responsibility statute made Rollins liable to

the plaintiffs for whatever portions of the judgments were not

recoverable from Tandem/Carrier and Chapman. Finally, the appellate

court ruled that Rollins could obtain reimbursement from

Tandem/Carrier on theories of contractual and implied indemnity;

the court did not believe, however, that an action for contribution

would lie. The court did not address Rollins' claim against Chapman

for implied indemnity.

          One member of the appellate panel concurred in part and

dissented in part. Justice Cerda disagreed with the majority's

interpretation of the Wisconsin financial responsibility statute

and would have limited the plaintiffs' recovery under that theory

to the amount of the insurance policy filed by Rollins pursuant to

the Wisconsin statute. Accordingly, he would also have vacated the

judgment in favor of Rollins and against Tandem/Carrier on Rollins'

counterclaim for indemnity. In addition, Justice Cerda would have

reduced McGregor's award for pain and suffering to $50,000,

bringing her total compensation to $52,215.

          We allowed petitions for leave to appeal filed by Rollins

and by Tandem/Carrier and Chapman. 155 Ill. 2d R. 315(a). The Truck

Renting and Leasing Association, Inc., and the Wisconsin Automobile

& Truck Dealers Association were each granted leave to submit

briefs as amici curiae in support of Rollins. 155 Ill. 2d R. 345.

          After we heard oral argument in this case, but before our

opinion could be filed, the plaintiffs settled their actions

against defendant Rollins for undisclosed amounts. Plaintiff Keva

Richardson executed a release and discharge in favor of Rollins on

October 1, 1996, and plaintiff Anne McGregor executed a release and

discharge in favor of Rollins on October 2, 1996. The plaintiffs

and Rollins then submitted to this court a stipulated order for the

dismissal of a portion of the claims involved in this appeal. We

allowed the order on November 7, 1996, dismissing with prejudice

Rollins' appeal from the judgments against it and in favor of the

plaintiffs. The question of Rollins' liability to the plaintiffs

under the Wisconsin financial responsibility law is therefore no

longer before us. The settlements do not affect the plaintiffs'

actions against Chapman and Tandem/Carrier, or Rollins' action

against Tandem/Carrier for contractual indemnity or its actions

Chapman and Tandem/Carrier for implied indemnity; Rollins may no

longer seek contribution from the other defendants, however (see

740 ILCS 100/2(e) (West 1994)).

                                     I

          In that portion of the appeal still remaining, Chapman

and Tandem/Carrier (defendants) first challenge the amounts of

damages awarded to the plaintiffs. The defendants contend that

certain errors in the testimony of the economist who appeared at

trial in behalf of Keva Richardson inflated the verdict returned in

her favor and, further, that the damages awarded by the jury to

Richardson and McGregor are excessive.

          In their initial challenge to the damages verdicts, the

defendants complain of certain testimony introduced by plaintiff

Richardson concerning the calculation of the present value of her

future economic losses. The defendants maintain that Professor

Charles Linke, who testified as Richardson's economist, improperly

used non-neutral, actual figures in describing to the jury the

calculation of present cash value. Richardson's life expectancy at

the time of trial, in May 1990, was 54.5 years. Relying on

information and figures supplied by Richardson's primary physician,

Professor Linke testified that the present cash value of her future

medical expenses had a lower bound of $7,371,914 and an upper bound

of $9,570,034. The lower bound figure assumed a discount rate one

percentage point higher than the growth rate; the upper bound

figure assumed that the two rates would be equal. The difference

between the two numbers was based on different assumptions

concerning future growth rates and interest rates. Professor Linke

also provided testimony regarding the present cash value of

Richardson's lost future earnings. Assuming a work history of 27.5

years, Professor Linke found that the present cash value of

Richardson's lost income was between $854,107 and $971,944; using

a longer work history of 35.8 years, Professor Linke arrived at a

range of $1,068,343 to $1,265,363. Again, the differences between

the two ranges were based on the witness' different assumptions

regarding future growth and interest rates.

          Citing Allendorf v. Elgin, Joliet & Eastern Ry. Co., 8

Ill. 2d 164 (1956), the defendants first contend that Professor

Linke was required to use "neutral" figures--amounts having no

relation to the damages alleged by the parties--in explaining the

concept of present cash value to the jury. In Allendorf, a wrongful

death action, this court stated:

                    "We are of the opinion that the proper method

               of assisting a jury in making damage calculations

               is for the actuary to use neutral figures. In the

               usual situation where hypothetical inquiries are

               permissible, it is necessary that the expert assume

               a factual situation as reflected in the proof in

               order to insure that his testimony bears upon the

               issue to be determined. The actuary, however, is

               called upon only to describe to the jury a

               mathematical process that will simplify the jury's

               task of determining the present value of the

               contribution that plaintiffs would have received

               had decedent not been killed. To accomplish that

               purpose it is not necessary that he use figures

               that correspond with those appearing in evidence,

               and when he does so there is a danger that the jury

               may be misled. Once the formula is before the jury,

               its application to the facts of the case is a

               matter for argument of counsel." Allendorf, 8 Ill.

               2d at 177-78.

          In the present case, the defendants assert that Professor

Linke was not qualified to testify to any specific amounts for Keva

Richardson's future medical costs, including those figures provided

by Dr. Yarkony, and that his use of the physician's estimates was

therefore in error. The defendants would limit Professor Linke's

testimony in this regard to the presentation of the appropriate

formula for reducing future damages to their present cash value.

          As Allendorf makes clear, the basis for the neutral-

figure requirement expressed in that case was the prohibition

against opinions on the ultimate issue. See Varilek v. Mitchell

Engineering Co., 200 Ill. App. 3d 649, 672 (1990). Subsequent cases

have removed that bar, however, and have determined that a witness,

whether expert or lay, may provide an opinion on the ultimate issue

in a case. Zavala v. Powermatic, Inc., 167 Ill. 2d 542, 545-46

(1995); People v. Harris, 132 Ill. 2d 366, 385 (1989); Freeding-

Skokie Roll-Off Service, Inc. v. Hamilton, 108 Ill. 2d 217, 221

(1985); Merchants National Bank v. Elgin, Joliet & Eastern Ry. Co.,

49 Ill. 2d 118, 122 (1971). The trier of fact is not required to

accept the expert's conclusion, and therefore such testimony cannot

be said to usurp the province of the jury. Zavala, 167 Ill. 2d at

545; Merchants National Bank, 49 Ill. 2d at 122. Because the rule

against opinions on the ultimate issue no longer has any vitality,

we believe that its corollary, which would require the use of

neutral figures in presenting the jury with testimony about present

cash values, has similarly lost its foundation. See M. Graham,

Cleary & Graham's Handbook of Illinois Evidence §702.7, at 571-72

(6th ed. 1994). Deprived of its theoretical footing, the "neutral

figure" requirement expressed in Allendorf should no longer be

followed.

          In a further objection to Professor Linke's testimony,

the defendants also briefly argue that the economist erroneously

included inflation and real growth in reducing Richardson's

economic damages to their present cash value. As we have noted,

Professor Linke testified to what he termed "lower bound" and

"upper bound" figures in computing the future medical expenses and

lost earnings. The "lower bound" figure assumed that the prevailing

interest rate would be one percentage point higher than the growth

rate of wages and prices, while the "upper bound" figure assumed

that the two rates would be equal. In this way, Professor Linke

attempted to avoid having to predict the exact rates that would

prevail; as Professor Linke explained in his testimony, it is not

the absolute levels of the interest rate and growth rate that

determine present cash value, but the difference between them. Cf.

Baird v. Chicago, Burlington & Quincy R.R. Co., 63 Ill. 2d 463,

467-70 (1976) (using differential).

          We believe that Professor Linke's methodology was

appropriate. In O'Shea v. Riverway Towing Co., 677 F.2d 1194, 1199-

1200 (7th Cir. 1982), Judge Posner explained the necessity of

treating inflation in a consistent manner in reducing an award of

future economic damages to present cash value:

                    "There are (at least) two ways to deal with

               inflation in computing the present value of lost

               future wages. One is to take it out of both the

               wages and the discount rate--to say to [plaintiff],

               `we are going to calculate your probable wage in

               [the future] on the assumption, unrealistic as it

               is, that there will be zero inflation between now

               and then; and, to be consistent, we are going to

               discount the amount thus calculated by the interest

               rate that would be charged under the same

               assumption of zero inflation.' ***

                    An alternative approach, which yields the same

               result, is to use a (higher) discount rate based on

               the current risk-free 10-year interest rate, but

               apply that rate to an estimate of lost future wages

               that includes expected inflation. ***

                    Either approach to dealing with inflation is

               acceptable (they are, in fact, equivalent) and we

               by no means rule out others; but it is illogical

               and indefensible to build inflation into the

               discount rate yet ignore it in calculating the lost

               future wages that are to be discounted. That

               results in systematic undercompensation, just as

               building inflation into the estimate of future lost

               earning and then discounting using the real rate of

               interest would systematically overcompensate."

          We conclude that Professor Linke's approach was a

reasonable one; by using a differential between the two rates, he

did not have to make a prediction of future growth and inflation

rates. Professor Linke was consistent in his treatment of

inflation, and he did not adopt a method that would undercompensate

or overcompensate the plaintiff. See Varilek v. Mitchell

Engineering Co., 200 Ill. App. 3d 649, 668-72 (1990); Stringham v.

United Parcel Service, Inc., 181 Ill. App. 3d 312, 316-21 (1989).

          The defendants next contend that the damages awarded to

the plaintiffs are excessive. Before resolving this question, we

will briefly summarize the evidence presented at trial regarding

the two women's injuries.

          Keva Richardson was 23 years old at the time of the

accident. She grew up in Pampa, Texas, and received a bachelor's

degree in elementary education in May 1987 from Texas Tech

University. While in college, she participated in a number of

athletic activities and was, by all accounts, a popular, happy

person. After graduating from college, Keva obtained a position as

a flight attendant with American Airlines. She planned to work in

that capacity for several years before returning to school to gain

a post-graduate degree in education; her ultimate goal was to

teach. Keva met Ann McGregor in the flight attendant training

program, and the two decided to room together upon completion of

their training. At the conclusion of the program, they were

assigned to the Chicago area, and they had moved there just several

days before the accident occurred.

          Following the accident, Keva was initially taken to

Highland Park Hospital for treatment. Because of the seriousness of

her injuries, however, Keva was transferred that morning to

Northwestern Memorial Hospital. Dr. Giri Gereesan, an orthopedic

surgeon specializing in spinal surgery, determined that Keva had

incurred a fracture of the fifth cervical vertebra, which severely

damaged her spinal cord and resulted in incomplete quadriplegia.

Dr. Gereesan performed surgery on Keva on December 1, 1987, to

stabilize her spine so that she would be able to support her head;

the surgery did not repair the damage to her spinal cord, and no

treatment exists that could do so.

          Keva was transferred to the Rehabilitation Institute of

Chicago in December 1987, where she came under the care of Dr. Gary

Yarkony. Keva was initially dependent on others in all aspects of

her daily life. At the Rehabilitation Institute she learned how to

perform a number of basic tasks, such as sitting in a wheelchair,

transferring from a bed to a wheelchair, brushing her teeth,

washing her face, and putting on loose-fitting tops. Keva's initial

stay at the Rehabilitation Institute lasted until April 1988, when

she moved to her parents' home in Texas. Keva returned to the

Rehabilitation Institute in 1988 and in 1989 for follow-up visits.

Keva also required hospitalization in Texas on three subsequent

occasions for treatment of conditions arising from the accident.

          Testifying in Keva's behalf at trial, Dr. Gary Yarkony,

who had served as her primary physician at the Rehabilitation

Institute, described Keva's current condition. He explained that

she cannot use her legs and that she has only limited functioning

in her arms, with loss of control of her fingers and fine muscles

in her hands. She suffers pain in her legs and shoulders. Her chest

and abdomen are paralyzed, and she has restrictive pulmonary

disease. In addition, she has no control over her bladder or bowel

functions and requires assistance in emptying them. As a

consequence of her physical condition, she is at risk for bladder

infections, pneumonia, and pressure ulcers. Keva also suffered a

number of facial injuries in the accident. Some of these scars were

later repaired through plastic surgery, but others remain.

          At trial, Keva's mother, Dixie Richardson, described her

daughter's current activities and the level of care necessary to

assist her in her daily routine. Keva requires help in taking a

shower and getting dressed. She cannot put on underwear, socks, or

pants by herself but is able to put on pullover shirts and

sweaters. With assistance, she can brush her teeth, apply makeup,

and put in her contact lenses. She is unable to cut food or button

a sweater. She can push her wheelchair on a smooth, level surface

but otherwise needs assistance. In her own testimony, Keva said

that she is self-conscious about her appearance now and the

impression she makes on others. She said that the thing she misses

most is just being able to get up in the morning and begin her day;

now she requires the assistance of others, throughout the day.

          The jury awarded Richardson a total of $22,358,814 in

damages, divided among the following six elements: $258,814 for

past medical care; $11,000,000 for future medical care; $900,000

for past and future lost earnings; $3,500,000 for disability;

$2,100,000 for disfigurement; and $4,600,000 for pain and

suffering. In challenging Richardson's award of damages, the

defendants first argue that the sum of the future medical costs

found by the jury--$11,000,000--is not supported by the evidence,

for it exceeds even the larger of the two figures supplied by

Professor Linke, $9,570,034. The defendants contend that the

decision to award Richardson nearly $1.5 million more illustrates

the jury's failure to properly determine damages in this case.

          In response, Richardson argues that the larger award may

simply be attributable to the jury's decision to make an award of

expenses that she is likely to incur in the future but that were

not specifically included in the calculations performed by

Professor Linke. Richardson notes that Dr. Yarkony, in compiling

for Linke's use the list of likely future medical costs, did not

assign specific values to certain items, such as the expenses of

future hospitalizations and the costs of wheelchairs and a

specially equipped van. Richardson thus argues that the jury's

decision to award an amount for future medical costs greater than

Professor Linke's higher estimate might simply reflect the jury's

desire to compensate her for those unspecified but likely expenses.

We agree with Richardson that the trier of fact enjoys a certain

degree of leeway in awarding compensation for medical costs that,

as shown by the evidence, are likely to arise in the future but are

not specifically itemized in the testimony. See Scheibel v.

Groeteka, 183 Ill. App. 3d 120, 138 (1989); Levin v. Welsh Brothers

Motor Service, Inc., 164 Ill. App. 3d 640, 659-60 (1987). In the

present case, however, the amount awarded by the jury for future

medical costs is nearly $1.5 million more than the higher of the

two figures claimed at trial by Richardson. Notably, Professor

Linke did not rely on the projections by the General Accounting

Office (GAO) of the growth of future medical care costs, mentioned

in the partial concurrence. Professor Linke explained that the

GAO's study included a large number of technology-based items,

while the main expense to be incurred by Richardson will be wages

for attendant care. Given the disparity between the trial testimony

and the jury's eventual award, we will not attribute the entire

difference between those sums simply to miscellaneous costs

Richardson is likely to incur in the future. For these reasons, we

conclude that it is appropriate, by way of remittitur, to reduce by

$1 million the nearly $1.5 million differential between the award

for Richardson's future medical expenses and the higher figure

presented in the testimony. This adjustment allows Richardson

recovery for expected future medical costs for which no specific

estimates were introduced, yet is not so large that it represents

a departure from the trial testimony.

          We do not agree with the defendants, however, that the

remainder of the award of damages to Richardson, including the sums

for pain and suffering, disability, and disfigurement, is

duplicative or excessive or lacks support in the record. The

determination of damages is a question reserved to the trier of

fact, and a reviewing court will not lightly substitute its opinion

for the judgment rendered in the trial court. See Lau v. West Towns

Bus Co., 16 Ill. 2d 442, 452-53 (1959); Marchese v. Vincelette, 261

Ill. App. 3d 520, 529-30 (1994). An award of damages will be deemed

excessive if it falls outside the range of fair and reasonable

compensation or results from passion or prejudice, or if it is so

large that it shocks the judicial conscience. Richter v.

Northwestern Memorial Hospital, 177 Ill. App. 3d 247, 257 (1988).

When reviewing an award of compensatory damages for a nonfatal

injury, a court may consider, among other things, the permanency of

the plaintiff's condition, the possibility of future deterioration,

the extent of the plaintiff's medical expenses, and the

restrictions imposed on the plaintiff by the injuries. Marchese,

261 Ill. App. 3d at 530.

          Here, it was the jury's function to consider the

credibility of the witnesses and to determine an appropriate award

of damages. We cannot say that the present award to Richardson is

the result of passion or prejudice, "shocks the conscience," or

lacks support in the evidence. The record shows that Richardson

suffered devastating, disabling injuries as a consequence of the

accident. The defendants urge us to compare Richardson's damages

with amounts awarded in other cases. Courts in this state, however,

have traditionally declined to make such comparisons in determining

whether a particular award is excessive (see Tierney v. Community

Memorial General Hospital, 268 Ill. App. 3d 1050, 1065 (1994);

Northern Trust Co. v. County of Cook, 135 Ill. App. 3d 329, 335

(1985)), and we do not believe that such comparisons would be

helpful here.

          The defendants also contend that the jury's award of

damages to Ann McGregor is excessive. McGregor was 22 years old at

the time of the accident. She grew up in Houston, Texas, and

graduated from Southern Methodist University in May 1987 with a

degree in psychology. Like Keva Richardson, McGregor was accepted

after graduation for a position as a flight attendant with American

Airlines. As mentioned earlier, the two women met while enrolled in

the flight attendant training program and were sharing an apartment

in the Chicago area at the time of the accident. Following the

accident, McGregor was taken to Highland Park Hospital, where she

was treated and released that day; she was then off work for about

two weeks. A laceration she suffered on her forehead eventually

healed, with only minimal scarring. At trial McGregor testified

that she continues to suffer from nightmares about the accident.

The jury awarded McGregor a total of $102,215 in damages, divided

among the following components: $1,615 for past medical expenses,

$600 for lost earnings, and $100,000 for pain and suffering.

          Like the dissenting justice below, we believe that the

award of $100,000 for pain and suffering is, in these

circumstances, excessive. McGregor was not seriously injured in the

accident, incurring a laceration on her forehead, which left only

a slight scar. The jury declined to award McGregor any compensation

for disfigurement; rather, the bulk of her recovery consisted of

compensation for pain and suffering. We conclude that a more

appropriate figure for pain and suffering would be $50,000, which

would reduce her total damages to $52,215. By way of remittitur, we

accordingly reduce the judgment entered in favor of McGregor and

against Tandem/Carrier and Chapman to that amount.

                                    II

          With Rollins having settled with the plaintiffs the

question of its liability to them under the Wisconsin financial

responsibility law, we now consider Rollins' claims against Chapman

and Tandem/Carrier. Rollins had previously sought contractual

indemnity from Tandem/Carrier, and implied indemnity and

contribution from Chapman and Tandem/Carrier. Any right that

Rollins might have had to obtain contribution from the other

defendants has been extinguished by its settlement with the

plaintiffs. 740 ILCS 100/2(e) (West 1994). Remaining before us,

then, are Rollins' action against Tandem/Carrier for contractual

indemnity, and its actions against Tandem/Carrier and Chapman for

implied indemnity.

          Both the trial judge and the appellate court concluded

that Rollins could seek indemnity from Tandem/Carrier under the

terms of the truck rental agreement between Rollins and

Tandem/Carrier. We agree, and conclude that Rollins is entitled to

contractual indemnity from Tandem/Carrier. A review of the

pertinent provisions of the agreement demonstrates Rollins' right

to that relief. Paragraph 4 of the terms and conditions of the

lease agreement between Rollins and Tandem/Carrier provides that

the lessee:

               "SHALL INDEMNIFY AND SAVE ROLLINS HARMLESS WITH

               RESPECT TO ANY AND ALL INJURY OR DAMAGE TO PERSONS

               OR PROPERTY ARISING OUT OF OWNERSHIP, MAINTENANCE,

               USE AND/OR OPERATION OF THE VEHICLE[.]"

In addition, paragraph 6(f) of the terms and conditions provides

that the lessee agrees to indemnify Rollins from

               "Claims or causes of action for death or injury to

               persons, or loss or damage to property in excess of

               the limits of liability insurance provided pursuant

               to this lease."

As the appellate court concluded, the plain language of the lease

agreement grants Rollins the contractual right to seek indemnity

from Tandem/Carrier for personal injury damages. Under the

preceding provisions, Rollins may obtain indemnity from

Tandem/Carrier for the amount in excess of the $1 million insurance

policy provided under the rental agreement.

          Tandem/Carrier argues, however, that another provision in

the lease agreement establishes that the contractual indemnity

provisions were not operative in this case. The provision cited by

Tandem/Carrier appears on the front side of the rental agreement,

following a list of optional forms of insurance coverage made

available to lessees, and it states:

               "IF RENTER DECLINES ANY OF THE ABOVE COVERAGES, HE

               SHALL BE BOUND TO THE CONDITIONS DETAILED ON THE

               REVERSE SIDE."

Because Tandem/Carrier accepted coverage in this case,

Tandem/Carrier argues that the indemnity provisions are not

applicable here. Tandem/Carrier believes that it would now be bound

by the conditions on the reverse side of the agreement, including

the indemnity provisions of paragraphs 4 and 6(f), only if it had

declined the offer of insurance coverage. We do not agree.

          As an initial matter, we believe that Tandem/Carrier's

interpretation of the agreement is refuted by paragraph 6(f), which

contemplates that a renter could both obtain insurance and have a

contractual duty to indemnify the vehicle owner. Paragraph 6(f)

requires a renter to indemnify the owner for "Claims or causes of

action for death or injury to persons, or loss or damage to

property in excess of the limits of liability insurance provided

pursuant to this lease." Thus, by the plain language of paragraph

6(f), the duty to indemnify exists even if the renter accepts an

offer of insurance.

          Moreover, Tandem/Carrier's interpretation of the

agreement proves too much. Under Tandem/Carrier's view, none of the

provisions on the reverse side of the rental agreement would take

effect if the lessee declined the offer of insurance coverage. This

could not have been the parties' intention, however. The reverse

side of the agreement contains a number of provisions that are

unrelated to insurance coverage and that are seemingly applicable

whether or not a lessee accepts coverage. For example, one of the

terms and conditions on the reverse side states that the rented

vehicle is the property of Rollins. We do not believe that the

applicability of that provision depends on whether the vehicle

lessee accepts or declines insurance coverage. We believe instead

that the import of the language cited by Tandem/Carrier is simply

to refer lessees to a particular provision on the back of the

agreement, applicable when insurance coverage is refused, requiring

the lessee in that event to obtain its own policy under which

Rollins is an additional insured.

          Tandem/Carrier also briefly argues that contractual

indemnity is unavailable here because the agreement does not

expressly allow indemnity for liability imposed pursuant to

statute, which is the basis for the plaintiffs' claims against

Rollins. The indemnity provisions are broadly written, however, and

do not restrict the availability of the remedy in the manner

suggested. We thus conclude that Rollins may obtain indemnity from

Tandem/Carrier under the terms of the parties' lease agreement. In

the wake of the plaintiffs' settlements with Rollins, we afforded

Rollins, Tandem/Carrier, and Chapman the opportunity to submit

additional briefs on the potential effect of the settlements on

Rollins' claims against the other defendants. With regard to the

action for contractual indemnity, Tandem/Carrier has rested on its

original briefs in this appeal and does not argue that the

settlement affects Rollins' right to obtain indemnity under the

lease agreement.

          Although our resolution of Rollins' contractual indemnity

claim against Tandem/Carrier renders moot Rollins' separate claim

against Tandem/Carrier for implied indemnity, our inquiry is not at

an end, for Rollins sought indemnity from Chapman, the driver of

the truck and not a signatory to the rental agreement, only under

an implied theory. We believe that Rollins is entitled to indemnity

on this additional ground. In Frazer v. A.F. Munsterman, Inc., 123

Ill. 2d 245, 261-64 (1988), and Thatcher v. Commonwealth Edison

Co., 123 Ill. 2d 275, 278 (1988), this court concluded that implied

indemnity was not available in a products liability action in which

the party seeking indemnity was negligent or otherwise at fault in

causing the underlying loss. Later, in American National Bank &

Trust Co. v. Columbus-Cuneo-Cabrini Medical Center, 154 Ill. 2d

347, 354 (1992), we held that the enactment of the Contribution Act

did not abolish common law actions for implied indemnity in quasi-

contractual relationships involving vicarious liability. See also

Faier v. Ambrose & Cushing, P.C., 154 Ill. 2d 384 (1993) (in legal

malpractice action against two attorneys, first attorney, who

settled with plaintiff, allowed under American National Bank

rationale to pursue claim for implied indemnity against second

attorney; second attorney, and not first attorney, had worked on

specific matter giving rise to malpractice action, while first

attorney handled separate aspect of case, and first attorney had

merely introduced plaintiff, his client, to second attorney).

          Although the releases executed by the plaintiffs in favor

of Rollins speak broadly and are not explicitly limited to actions

under the Wisconsin statute, we do not believe that Rollins is

precluded from obtaining indemnity because it may be negligent or

otherwise at fault, as Chapman contends. Rather, the present claim

for implied indemnity fits within the rule expressed in American

National Bank. The judgments obtained by the plaintiffs against

Rollins were based entirely on Rollins' alleged duty under the

Wisconsin financial responsibility law. We note, moreover, the

presence of a preoccurrence relationship of lessor/lessee between

Rollins and Tandem/Carrier, Chapman's employer, a circumstance in

which an implied right of indemnity has been found. See Kerschner

v. Weiss & Co., 282 Ill. App. 3d 497, 503-04 (1996). Just as

Rollins would, in these circumstances, possess a right of implied

indemnity against Tandem/Carrier, so too do we believe that Rollins

may assert the same right against Chapman, who was Tandem/Carrier's

agent. Here, the indemnity defendants make no argument that an

implied right of indemnity against the lessee would not also be

effective against the driver. In the present case, Rollins is

liable not because of anything it did or failed to do, but solely

as a consequence of Chapman's negligence, and of the lower courts'

interpretations of the Wisconsin statute, an issue not now before

us. Rollins was not negligent or otherwise at fault in causing the

loss, and Chapman has not explained why the settlement should deny

Rollins a right to implied indemnity; thus, we conclude that it is

appropriate to permit Rollins to obtain implied indemnity in this

case.

                                  *  *  *

          For the reasons stated, the judgment of the appellate

court is affirmed in part, reversed in part, and vacated in part,

and the judgment of the circuit court of Cook County is affirmed in

part, reversed in part, and vacated in part. Pursuant to the

authority of Supreme Court Rule 366(a)(5) (155 Ill. 2d R.

366(a)(5)), we affirm the judgments entered in favor of plaintiffs

and against Tandem/Carrier and Chapman in their reduced amounts. In

the absence of consent to the entry of a remittitur by each

plaintiff within 21 days of the filing of this opinion or any

further period in which the mandate is stayed, her individual

action will be remanded to the circuit court of Cook County for a

new trial on the question of damages. Otherwise, this cause is

remanded to the circuit court of Cook County for entry of judgment

on Rollins' claim for indemnity in an amount consistent with this

opinion and the settlement between plaintiffs and Rollins.

Judgments affirmed in part, reversed in part,

                                                     and vacated in part;

                                                          cause remanded.

                                                                         

          JUSTICE McMORROW, concurring in part and dissenting in

part:

          I concur in the opinion of my colleagues in all but one

respect: I do not agree with the majority that it is proper to

order a remittitur of the jury's award of damages to Keva

Richardson for present cash value of future medical expenses or the

jury's award to Ann MacGregor for pain and suffering.

          In determining the total verdict awarded to Richardson,

the jury considered extensive evidence relating to six separate

components of damages. As noted by the majority, Richardson

"suffered devastating, disabling injuries." The appellate court

majority's unpublished opinion describes her condition:

               "After the collision, doctors determined that the

               communication connection between Richardson's brain

               and the rest of her body had become severed and she

               was rendered a quadriplegic. Richardson was soon

               placed in traction with tongs affixed to her skull

               by driving screws into the side of her head. She

               was also placed in a roto-rest bed with 25 pounds

               weights attached to her body for traction.

               Eventually, Richardson underwent surgery to

               stabilize her spine so it could support the weight

               of her head which hung like a rag doll's head. In

               that operation, bone from her hips was grafted to

               her cervical spine with the use of metal plates and

               screws. The surgery did not repair the injury to

               Richardson's spinal cord, nor does medical

               technology yet exist to rectify the injury." 

Other evidence related Richardson's need for assistance every six

hours to empty her bladder by catheterization and daily assistance

to empty her bowel, over which she permanently lacks control. She

has lost the use of her legs, fingers, and the fine muscles of her

hand. Her chest and abdomen are paralyzed. She is subject to risk

of serious infections and other conditions and, according to the

evidence, having a child would be life-threatening. The appellate

court opinion further stated that Richardson "may expect to be

hospitalized on a regular basis for the balance of her life."

          The jury awarded $11 million to compensate Richardson for

her future medical needs. To this sum the majority applies a

remittitur of $1 million, based on the majority's observation that

the jury's award for this element of damages exceeded by $1.5

million the testimony of economist Charles Linke regarding the

"upper bound" of the present cash value of Richardson's future

medical needs. Linke explained that he calculated a "lower bound

present value ($7.4 million) and an upper bound present value ($9.5

million)." His figures were derived from different assumptions

regarding the relationship of the rate of interest to the rate of

growth. In explaining his economic assumptions and methods, Linke

also noted that there were different accounting methods that could

be used to calculate Richardson's future medical needs. The one he

employed yielded a more conservative figure for medical care than

that used by the General Accounting Office, which, according to

Linke, would yield the conclusion that "the present value of Keva

Richardson's care needs would be approximately 12.1 million

dollars."

          In assuming that the $9.5 million "upper bound" figure

represents the maximum amount that is sustained by the evidence

with respect to Richardson's future medical expenses, the majority

opinion fails to acknowledge that the information upon which Linke

based his calculation of present cash value of future medical

expenses represented Richardson's minimum care needs for the rest

of her life. Dr. Yarkony, upon whose testimony Linke's economic

analysis was based, detailed the specific types of medical expenses

that Richardson would be expected to need in the coming years. Dr.

Yarkony testified, "[T]his is the basic minimum care not covering

any hospital admissions for emergencies, complications, and the

like." He further testified that in his opinion Richardson would

continue to require hospitalizations in the future caused by

complications related to her spinal cord injury, including

infections, pressure sores, pneumonia, and blood clots.

          Notwithstanding the above testimony of Linke and Dr.

Yarkony, the majority determines that the jury improperly affixed

damages for future medical costs in an amount exceeding the

experts' estimates by $1.5 million. The majority concedes that the

jury could properly compensate Richardson for medical costs not

otherwise included in the experts' calculations. The majority

permits one third of the excess award to stand, and concludes that

$500,000, rather than $1.5 million, represents the appropriate

additional sum the jury could award in excess of Linke's upper

bound estimate of $9.5 million. In so holding, the majority usurps

the jury's function and substitutes its own judgment regarding what

is reasonable and fairly supported by the expert economic and

medical evidence with respect to the present value of Richardson's

future medical costs. The majority's application of remittitur in

the case at bar thereby operates as an arbitrary limitation on the

jury's ability to assess the evidence. See, e.g., Lee v. Chicago

Transit Authority, 152 Ill. 2d 432, 470 (1992); Barry v. Owens-

Corning Fiberglas Corp., 282 Ill. App. 3d 199, 207 (1996); Riley v.

Koneru, 228 Ill. App. 3d 883 (1992); Chambers v. Rush-Presbyterian-

St. Luke's Medical Center, 155 Ill. App. 3d 458 (1987); Shaheed v.

Chicago Transit Authority, 137 Ill. App. 3d 352 (1985); Guerrero v.

City of Chicago, 117 Ill. App. 3d 348 (1983). 

          In Riley, 228 Ill. App. 3d at 887-88, the appellate court

summarized the applicable law of remittitur:

                    "Damages are a question of fact to be decided

               by the jury, and courts are reluctant to interfere

               with the jury's exercise of discretion in this

               area. [Citations.] A reviewing court will not

               disturb a jury's award of damages unless it is

               obviously the result of passion or prejudice.

               [Citation.] Furthermore, an award is not excessive

               unless it falls outside the necessary limits of

               fair and reasonable compensation or it shocks the

               judicial conscience. [Citation.] A jury's award

               will not be subject to remittitur where it falls

               within the flexible range of conclusions which can

               be reasonably supported by the facts. [Citation.]"

In Barry v. Owens-Corning Fiberglas Corp., the court rejected

defendant's argument that a wrongful death award of $6,850,000 and

a total verdict in excess of $12 million was grossly excessive and

should have been reversed or subject to remittur. The court stated,

"Reviewing courts rarely disturb jury awards. For good reason. ***

[Jurors] use their combined wisdom and experience to reach fair and

reasonable judgments. We are neither trained nor equipped to

second-guess those judgments about the pain and suffering and

familial losses incurred by other human beings." Barry, 282 Ill.

App. 3d at 207.

          Nothing in the record or the itemized jury verdict

indicates that the jury departed from its customary duty to weigh

the evidence and assess damages that would fairly compensate

Richardson for her permanent and disabling injuries. The jury's

award for future medical expenses, which arguably exceeded certain

testimony, does not warrant the conclusion that the jury's

determination was a departure from the flexible range of damages

that was reasonably supported by the facts. There is no indication

that the jury's award was the product of passion or prejudice. In

fact, with respect to a different component of damages, i.e,

Richardson's past and future lost earnings, the jury awarded a sum

that was $1.265 million less than the higher of the testimonial

estimates presented for that item of damages. If experts' estimates

of a person's future income losses or medical expenses were an

exact science capable of mathematical precision, there would be no

need to have a jury make the final determination of proven damages.

          In the case at bar the jury heard all of the evidence,

including the basis for the expert testimony. It appears

uncontested that the evidence of Richardson's future medical

expenses did not include every anticipated item, such as special

equipment and repeated hospitalizations that are likely to occur in

the future because of the serious conditions Richardson suffers as

a result of her quadriplegia. The testimonial estimate of the

present cash value of Richardson's future medical needs is only

that--an estimate. This estimate was elicited as a minimum

projection of Richardson's medical needs in the years to come. In

light of these considerations, I would affirm the appellate court's

holding that the variance between the jury's award for future

medical needs and the experts' projection is "certainly not so

great a variance that we must reject the verdict of people whom we

have instructed to use their own observation and experience in the

affairs of life during their deliberations." 

          Similarly, I depart from the majority's holding that Ann

MacGregor's damages award of $100,000 for pain and suffering was

excessive. The majority orders a remittitur of $50,000 as a "more

appropriate figure for pain and suffering." Slip op. at 12. The

majority appears to base its conclusion on the relatively minor

injury MacGregor sustained, noting that she suffered a laceration

on her forehead that healed with only minimal scarring. Although

the majority views the award of $100,000 as overly generous for a

facial laceration that did not result in permanent disfigurement,

the majority substitutes its own subjective judgment for the jury's

evaluation of the evidence. The record indicates that MacGregor's

lacerated forehead took six months to heal. The record further

indicates that she suffered ongoing trauma, including recurrent

nightmares resulting from the rear-end collision that left the

other occupant of the car a quadriplegic. The jury, as finder of

fact, had the superior ability to assess the evidence, including

MacGregor's testimony relating to her traumatic and painful

experience. I am aware of no sound reason to nullify the function

of the jury and arbitrarily reduce MacGregor's award for pain and

suffering to $50,000. Therefore, I cannot concur in the reasoning

or result of the majority with respect to the reduction by

remittitur of both plaintiffs' verdicts.

          For the reasons stated, I concur in part and dissent in

part from the judgment of the majority.

          JUSTICE FREEMAN joins in this partial concurrence and

partial dissent.